IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES J. GOLDBLUM, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil No. 04 - 520 |
| | ) | Judge Arthur J. Schwab |
| EDWARD KLEM, Superintendent, SCI | ) | Magistrate Judge Lenihan |
| Mahanoy; et al., | ) | |
| | ) | |
| Respondents. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.     RECOMMENDATION

It is recommended that this petition for writ of habeas corpus be dismissed and that a certificate of appealability be denied.

### II.     REPORT

Presently before the court is a counseled petition for writ of habeas corpus filed by a state prisoner, Charles Goldlum.  Goldblum was found guilty by a jury on August 30, 1977 of murder in the first degree in the February 8, 1976 stabbing death of George Wilhelm, and is serving a life sentence for that conviction.  He was also convicted of related offenses (and the manner in which these claims relate will be explained below) for conspiracy to commit theft by deception, arson and criminal solicitation to commit arson.  He was sentenced to an additional 15 to 30 years imprisonment for the related offenses, and was ordered to pay $20,000 in restitution.  Goldblum's appeals in both the state and federal courts from his conviction and sentence have spanned the better part of three decades.  This is the second petition for writ of habeas corpus filed by Goldblum in this case, with the

first having been filed at Civil Action No. 89-1493.  The prior petition was denied on its merits on

October 31, 1990.  Goldblum, through counsel, has obtained permission from the Court of Appeals

for the Third Circuit to file a second petition for writ of habeas corpus in this court.  See, 28 U.S.C.

§ 2244(b)(3)(A).

    The procedural history set forth below is, of necessity, lengthy and detailed.  The Court

of Appeals offered little guidance, leaving this court no choice but to address all of the issues raised

in the Petition. It is also noted that most of the issued raised in this matter have been addressed, in

some fashion, in more than one state court appeal, and those appeals themselves have involved

remands and additional hearings.  Accordingly, the need for a detailed recitation of the procedural

history, and for a recitation of a some of the extensive evidence presented at trial and at the various

hearings held during the 28 years since Goldblum's state court conviction.[1]


   **A.  Procedural history.**

---

[1]  The Court of Appeals issued the following order on March 29, 2004:

> The foregoing application under 28 U.S.C. §2244 to file a second or successive
> petition under 28 U.S.C. §2254 is granted.

The Court declined to note which of the several issues presented by Goldblum it believed met
the applicable standard for permitting a second or subsequent petition.  At least some of the claims
presented by Goldblum clearly do not satisfy that standard, and I believe, therefore,
that the Court of Appeals intended for review to be had with respect to some, but not all, of
the claims Goldblum raises.  However, since the order issued by the  Court of Appeals
provides no guidance in this respect, I am left to conclude that the Court intended that all of
the claims presently raised in the instant petition be addressed.  Of course, as explained below,
this simply permits the filing of the petition, and does not inform this Court's analysis
concerning possible abuse of the writ, exhaustion, procedural default, or the merits of the
claims themselves, if reached.

1.      **Overview.**

The crux of this case is the importance of the testimony of Clarence Miller to petitioner Goldblum's conviction.  Miller, in a trial held after Goldblum's, was also convicted of first degree murder with regard to George Wilhelm's death.  The singular truth in this case is that the Goldblum trial was a swearing contest between Miller, who claimed that Goldblum planned to, and did, kill Wilhelm to keep an arson Goldblum had Wilhelm commit a secret, and Goldblum who claimed that Miller killed Wilhelm because Wilhelm insisted on collecting a debt he was owed by Miller.  Both men admitted to being at the scene, which was the top floor of a Pittsburgh parking garage, where all three were in Wilhelm's car.  The events which transpired inside and then outside of the car were hotly contested at trial, and have been the subject of intense scrutiny by a succession of counsel representing Mr. Goldblum.  What is clear is that either Goldblum or Miller, or both, stabbed Wilhelm 25 times with one half of a grass shear, causing his death.  After the assault, the men agreed on an alibi, and left the scene together.  The jury in Goldblum's case determined either that Goldblum directly participated in the assault, or was an accomplice to Miller's actions.  Goldblum appears for the second time before the federal courts seeking to have this jury determination overturned.

A remarkable succession of attorneys has expended every effort, beginning with the filing of the charges in this case, to discredit and disprove Miller's testimony that Goldblum murdered Wilhelm.[2]  This latest attempt to challenge Miller's trial testimony is premised upon after-discovered

---

[2]      Trial counsel was H. David Rothman, Esquire, and direct appeal counsel was the late Honorable Charles Scarlata, Esquire, joined by Howard Sinclair, Esquire.  PCHA counsel in 1986 was Robert L. Potter, Esquire, who then filed Goldblum's initial federal habeas petition and litigated that to its conclusion with the assistance of Frank Arcuri, Esquire.  Goldblum's second state collateral petition, filed in 1996, was initially litigated by Rhonda Neft, Esquire, Jon Pushinsky, Esquire, and Lyn Ackerman, Esquire, who all gave way to present counsel in 1998.

evidence that Miller has (not for the first time) changed his version of events, and newly-obtained (although available at the time of trial) expert forensic testimony.  The list of exhibits relied upon in Goldblum's petition is intriguing in itself: reports by several forensic experts purporting to divine the actual events of the night of the Wilhelm murder through a police officer's brief description of a single line of blood drops spattered upon the dashboard of Wilhelm's car; testimony from a former warden who (relatively) recently overheard Miller give a different account of events in the presence of then Pennsylvania Attorney General and now Circuit Judge D. Michael Fisher of the United States Court of Appeals for the Third Circuit; a letter from the trial judge, now retired from the federal bench, and authored during unsuccessful clemency proceedings for Goldblum, that he believes the jury "got it wrong" in deciding issues of credibility; an affidavit from the prosecuting attorney to the same effect; and remarkably, allegations that both the police investigative file in this case, and the coroner's file were removed and/or destroyed, with the latter allegedly occurring in the mid-1990's in order to thwart then pending PCRA proceedings with respect to this 1977 conviction.

With this overview of the more unusual aspects of this case, the more particular history is as follows.

Goldblum was charged at No. CC 7601267 in the Court of Common Pleas of Allegheny County, Pennsylvania, with murder and voluntary manslaughter in relation to Wilhelm's death.  He was also charged at No. CC 197603198 with Criminal Conspiracy in relation to a fraudulent land deal whereby Goldblum was alleged to have assisted Miller and others in defrauding Wilhelm out of $20,000 in a fake deal for property in North Carolina.  Finally, Goldblum was charged with Arson at No. CC 197604826 and Criminal Solicitation to Commit Arson at No. CC 197604830.  Goldblum was alleged to have solicited Wilhelm to burn down a restaurant owned by Goldblum so

that Goldblum could collect the insurance proceeds.  After several pretrial motions, the case proceeded to trial before the Honorable Donald Zeigler on August 18, 1977.

### 1.      Evidence at trial.

The prosecution's evidence at trial tied together the land fraud scheme, the arson at Goldblum's restaurant, and the brutal murder of George Wilhelm.

### a.      Land Fraud.

George Wilhelm received about $40,000 in an insurance settlement in 1974 (Tr. 77)[3]. He intended to use it to purchase land in North Carolina on which he would search for semiprecious rocks and gemstones (Tr. 76-77).  Clarence Miller met Wilhelm in 1974 through Fred Orlosky, and promised to assist Wilhelm in purchasing land by using Miller's asserted political connections (Tr.158, 161).  Orlosky and Miller decided to defraud Wilhelm when they discovered that the land Wilhelm wanted to purchase was federal forest land and not for sale (Tr. 171-175).  It was at this point that Thaddeus Dedo and petitioner Goldblum were brought into the scheme (Tr. 174), which involved convincing Wilhelm that a special and secretive political deal was being worked out to obtain government-owned land.  To this end, Dedo impersonated a member of then-Senator Robert Schweiker's staff, and represented that the "deal" was being accomplished with the Senator's help (Tr. 174).

Several meetings between Dedo (as "Ken Manella" from Senator Schweiker's office) and Wilhelm ensued, with payments of $6,000, $3,000, $500 and $1,500 being made by Wilhelm through the summer and fall of 1974 (Tr. 225-231; 241-250; 255-258; 279).  Miller was in contact

---

[3]      Numerals in parentheses preceded by the letters "Tr." refer to pages in the Trial Transcript which has been forwarded to this court as part of the state court record.

with Goldblum all during this time frame, calling Goldblum so often at work that the switchboard operator complained (Tr. 255; 407).  Fake deeds to land in North Carolina, which Miller said were drafted by Goldblum, were given to Wilhelm (Tr. 225-231).

Wilhelm became suspicious of the land deal when he actually went to Senator Schweiker's office and met the real Ken Manella (Tr. 285, 322).  Wilhelm's subsequent complaints eventually went to the Federal Bureau of Investigation (Tr. 348-372).  The ensuing FBI investigation was terminated, however, when Wilhelm informed investigators that the complaint was a hoax intended to embarrass Senator Schweiker (Tr. 373-377).  Wilhelm agreed to thus cause the investigation to be ended after Goldblum promised that Wilhelm would get his money back (Tr. 287, 299, 301, 308-309).

### b.     Arson.

Goldblum's parents purchased a restaurant which he then leased and operated as "The Fifth Avenue Inn."  Insurance coverage on the building was increased in May, 1975, from $150,000 to $200,000 (Tr. 1741), with the contents insurance increasing from $30,000 to $40,000 in November, 1975 (Tr. 1742).  There was also $65,000 in business interruption insurance (Tr. 1744).  An insurance company inspection on November 25, 1975 and a previous City of Pittsburgh fire inspection were both unremarkable (Tr. 1956-1970; 532-533).

The restaurant burned to the ground on November 30, 1975, in an obvious arson at a time when Goldblum was desperate financially since the restaurant had been operating at a loss (Tr. 580-581)[4].  Miller testified that Goldblum twice solicited Miller to burn the restaurant, and included

---

[4]     In fact, Goldblum denied at trial that he was involved in the fire.  Now, however, he concedes that he "arranged to burn it down" as a result of a series of "bad business decisions [which]

Dedo and Orlosky in those solicitations (Tr. 450-454).  Miller, Orlosky and Dedo met Goldblum at

the restaurant on November 30, 1975, at about 2:00 in the afternoon.  Goldblum showed Miller where

sterno had been poured into holes in the walls (Tr. 455-456).  Employees were still in the restaurant

decorating it for the holidays, so the men left.  The men later returned to the restaurant, and Miller

refused to burn down the building.  Goldblum said that he would have to get Wilhelm to do it (Tr.

465).  Miller left the restaurant about 5:30 p.m., after the employees had left.  The building was

engulfed in flames within an hour, and ultimately burned to the ground.  Goldblum bragged to Miller

the following day, "I did a pretty good job, didn't I?" (Tr. 470).  Goldblum later told Miller that he had

promised Wilhelm $3,500 and complete repayment of the earlier land fraud once Goldblum got the

insurance proceeds (Tr. 471).

Wilhelm began asking Miller whether Goldblum had received his insurance money,

and indicated that Goldblum owed Wilhelm $3,500 (Tr.T477).  Wilhelm told Miller that he had made

a telephone call to Goldblum's office and said, "Tell Mr. Goldblum this is the 'torch man'.  If he

doesn't pay I'm going to the authorities." (Tr. 477).  Such a call was actually received at Goldblum's

office (Tr. 416).  Miller testified that Wilhelm began pressing Goldblum for payment, and that

Goldblum became concerned about Wilhelm's threats to go to the police (Tr. 645-648, 654).


### c.      Murder.

Miller testified that he and Goldblum met on Sunday, February 8, 1976 (Tr. 657).

Goldblum told Miller that he intended to beat Wilhelm up to discourage him from pressing Goldblum

for payment of a debt (Tr. 659).  Miller agreed to lure Wilhelm to the top floor of a parking garage

---

led [him] to the point of desperation . . .." (Docket #1 at 38).

in return for a $50 payment from Goldblum, and arranged a meeting with Wilhelm for the evening of February 9, 1976 (Tr. 662-664). The victim was told that the purpose of the meeting was for Goldblum to pay Wilhelm the money he was owed.

Wilhelm drove Miller to a McDonald's restaurant at 7:45 p.m. Miller left at 8:30 p.m. and met Goldblum in a nearby alley (Tr. 666). Goldblum put a pair of pants over the pants he was wearing, and they both went to meet Wilhelm at the McDonald's restaurant (Tr. 667, 669). Goldblum told Wilhelm to drive to the top floor of a nearby parking garage, and Wilhelm turned off the ignition. Wilhelm was driving, Miller was in the front passenger seat, and Goldblum was seated in the back seat behind the driver. Miller then testified that Goldblum struck Wilhelm in the head with a wrench, after which Wilhelm fell out of the car (Tr. 682). Goldblum then began stabbing Wilhelm with a grass shear blade, yelling, "This will shut you up, faggot!" (Tr. 675, 682). Wilhelm eventually fell over a wall after Goldblum had struck him numerous times with the grass sheer blade (Tr. 674, 676-679). Goldblum and Miller left the scene and formulated an alibi whereby each would say that they left Wilhelm at the McDonalds at 9:10 p.m. (Tr. 697). Miller testified that Goldblum threatened him to "keep your mouth shut . . . because it will be my word against yours." (Tr. 697).

Wilhelm was found at 9:22 p.m., lying on the roof of a walkway to a building adjoining the parking garage crying for help (Tr. 1175, 1293-1294). Police arrived on the scene, and Wilhelm said to them, "Clarence Miller did this to me." (Tr. 1528). Wilhelm died a few hours later from internal bleeding caused by 25 stab wounds (Tr. 1550-1567).

Miller was arrested the following day (Tr. 1360-1362). Miller gave the alibi he and Goldblum had discussed, i.e., that they met Wilhelm at the McDonald's Restaurant, but left him there at 9:10 p.m. (Tr. 1364). Police then questioned Goldblum, who gave the same alibi but with a few

8

discrepancies.  When later confronted with these discrepancies, Miller fainted and was transported

to a hospital (Tr. 1372).  He implicated Godlblum in Wilhelm's murder later that same day.


### d.    Goldblum's defense.

Petitioner Goldblum also testified at trial.  His testimony was accurately and succinctly

set forth in Judge Sensenich's August, 1990 Report and Recommendation at Civil Action No. 89-1493

in part as follows:

> Petitioner testified that he first met Wilhelm the day before the
> homicide. (Tr. 2122).  In late December of 1975 or January of 1976 Miller had
> told him that he had gotten into a problem with Wilhelm that was coming to
> a head. (Tr. 2123).  Miller told him that he and another guy had bilked
> Wilhelm out of approximately $20,000. (Tr. 2128).  Miller also told him about
> preparing the false affidavit for the F.B.I. (Tr. 2131-2132).  After they
> discussed Miller's options, Miller told him he would pay Wilhelm the money
> he owed him. (Tr. 2138).  Miller led him to believe that Wilhelm was still
> waiting for the real estate deal to be finalized.  Miller set up a meeting for
> Sunday to explain the situation to Wilhelm and tell him that he would give him
> his money back. (Tr. 2201-2201).  They agreed to meet at McDonald's
> Restaurant near petitioner's office.  He and Miller met at his building and went
> to the restaurant where they met Wilhelm .  During the meeting, Miller told
> Wilhelm that he had not been able to contact Ken Manella.  That was the first
> petitioner had heard that name.  The meeting broke up and they agreed to meet
> the following evening. (Tr. 2211).  Petitioner testified he told Miller that he
> had the option of either paying Wilhelm back or retaining a criminal attorney
> to represent him. (Tr. 2212).  He denied that Wilhelm had ever called him and
> complained that he owed him any money. (Tr. 2219).

> On Monday, February 9, 1976, petitioner worked in his office and then
> taught a course at the University of Pittsburgh.  He met Miller in front of
> Pittsburgh National Bank (Tr. 2229) and they walked to McDonald's
> Restaurant where they met Mr. Wilhelm.  After five or ten minutes Wilhelm
> told them he had to move his car because it was illegally parked. (Tr. 2232).
> They all got into Wilhelm's car.  Wilhelm was driving, Miller was in the right
> front seat and petitioner was in the rear. (Tr. 2235).  One of the others
> suggested that they go to the top of the garage.  Then Miller told Wilhelm that
> it was going to take him a few years to pay him back.  Wilhelm got angry.
> They started shouting and yelling back and forth. (Tr. 2237).  They started to

fight.  Wilhelm hit Miller in the face and they were grappling in the front seat. (Tr. 2237).  Suddenly they broke apart, and Wilhelm opened his door and fell to the ground, calling for help.  Petitioner got out of the car and ran because he was frightened. (Tr. 2241).  Miller then dragged Wilhelm to the wall and flipped him over. (Tr. 2244).  He heard a thud and he went over to the wall and saw Wilhelm lying very still on his back.  He thought he was dead. (Tr. 2246). He ran for his car, followed by Miller who begged for a ride home because he was covered with blood and could not take the bus. (Tr. 2252).  Miller asked him to help cover for him and he agreed to say that he had met Wilhelm at the restaurant, that Wilhelm had left and he had taken Miller home. (Tr. 2252-2253).

(Civil Action No. 89-1493, Docket #16 at 9-12).


      **e.**        **Goldblum's attempt to have Miller killed.**

A confidential informant told police on November 16, 1976, that Andy Kisner Bey was involved in a conspiracy to kill someone (Tr. 1400-1405).  When contacted by policy, Bey stated that Goldblum solicited him to kill Clarence Miller and had actually given Bey money to this end (Tr. 1406-1407).  Bey stated that he did not intend to actually kill Miller, but only to obtain money from Goldblum and then keep putting him off (Tr. 1406-1407).  Bey then told Goldblum that he had found someone willing to kill Miller (Tr. 1408).  At this point, the police intervened, sending Detective John Mook posing as the proposed "hit man" (Tr. 1408).  A meeting took place under police surveillance on November 19, 1976, and Goldblum agreed to pay Mook $2,000 to kill Miller (Tr. 1434-1450). Goldblum was arrested later that day and his bond on the pending charges regarding the Wilhelm murder was revoked.


      **2.**        **Post-trial proceedings and direct appeal.**

The jury in this case returned verdicts of guilty on all crimes charged, including First Degree Murder, on August 30, 1977.  The penalty for murder was fixed at life imprisonment. Goldblum was sentenced on the remaining counts to an aggregate total of 15 to 30 years imprisonment.

Trial counsel Rothman filed post-trial motions on September 6, 1977, which raised a host of claims (Docket #7, Commonwealth's Exhibit 14).  It is not necessary for the instant report that all of the specific claims be restated here.  Goldblum did, however, challenge the following matters, which shed some additional light on the trial in this case:

> 5.   The court erred in receiving hearsay statements of the deceased, particularly those statements purportedly made to William Hill, President of the Fraternal Association of Steel Haulers, wherein the deceased allegedly indicated he knew the accused prior to February 6, 1976, and wherein he allegedly indicated that the accused was an attorney involved in the victim's purchase of land in North Carolina.

> *   *   *

> 7.   The Court erred in denying defendant's demurrer to the evidence because the prosecution's case rested upon the uncorroborated testimony of the accomplice Miller, an admitted perjurer.

> *   *   *

> 15.  Despite the fact that defendant waived counsel's previous request to permit the jury to consider verdicts of involuntary manslaughter and hindering apprehension, the court improperly restricted counsel's closing argument by directing counsel to refrain from referring to the clear possibility of defendant's guilt of these particular defenses.

> *   *   *

> 21.  Defendant was deprived of a fair trial because of the Commonwealth's negligence in failing to photograph and examine the blood inside the victim's car and the physical condition of Clarence Miller observed by police the morning after the homicide.

(Id., Commonwealth's Exhibit 14).  The motions were denied on September 19, 1977.  Goldblum was

sentenced by Judge Ziegler on October 3, 1977, to life imprisonment and an aggregate consecutive

term of 15 to 30 years.

        The convictions were appealed to the Supreme Court of Pennsylvania by the Allegheny

County Public Defender.[5]  The Public Defender withdrew, and Charles F. Scarlata, Esquire, and

Rodney F. Page, Esquire, took over prosecution of Goldblum's appeal in July, 1978.  The Supreme

Court denied a motion seeking a remand on the basis of after-discovered evidence and Goldblum

sought to supplement the record with excerpts from Clarence Miller's trial (Docket #7,

Commonwealth's Exhibit 27).  More specifically, two experts testified at Miller's trial that Miller

suffered form organic brain damage, resulting from a childhood accident, which affected his ability

to know, recall and recount the truth.  They testified that he had a disorder known as "confabulation,"

causing the unconscious integration of fact and fiction.  It was this expert testimony at Miller's own

trial, held after Goldblum's trial was completed, that was the basis for the motion filed by Goldblum's

attorneys.  Goldblum's appellate counsel filed a brief in support of the appeal asserting, inter alia, that

Goldblum was entitled to a new trial on the basis of after-discovered evidence in the nature of the

medical testimony from  Clarence Miller's trial to the effect that Miller suffered from a mental defect

affecting his ability to know and appreciate the truth (Docket #7, Commonwealth's Exhibit 29).  The

Supreme Court transferred jurisdiction over the appeal to the Superior Court of Pennsylvania on July

12, 1979.

---

[5]     The conviction for First Degree Murder by rule was filed in the Pennsylvania Supreme Court, while the appeal from the remaining, but related, convictions was filed in the Pennsylvania Superior Court. Superior Court certified the latter appeal to the Supreme Court of Pennsylvania, and the appeals were thereafter consolidated.

After additional briefing, the Superior Court affirmed the judgment of sentence on May 23, 1980, with the exception of the conviction of Criminal Conspiracy to commit Theft.  As to this conviction, the Superior Court reversed on the basis that the indictment failed to allege that Goldblum had committed any acts in Allegheny County (Docket #8, Commonwealth's Exhibit 36).  A subsequent petition for reargument was denied, but the Supreme Court of Pennsylvania granted cross-petitions for allowance of appeal.  Counsel for Goldblum again moved for a remand to consider after-discovered evidence, including evidence set forth in Miller's state collateral appeal in which Miller now maintained that he blacked out during the key events, and remembered nothing about the Wilhelm murder.  The Supreme Court granted the motion for the limited purpose of conducting a hearing on the after-discovered evidence claim (Docket #8, Commonwealth's Exhibit 49).

Judge Ziegler had been appointed to the federal bench since Goldblum's conviction and, hence, the Honorable John W. O'Brien was assigned to the matter on remand to the trial court.  An evidentiary hearing was held on January 28 and 29, and concluded on February 16, 1982.  Drs. Van Cara and Merikangas were called as witnesses to recount their testimony from Miller's trial concerning Clarence Miller's testimonial competence.  Goldblum's counsel then filed a motion for new trial on the basis of after-discovered evidence, and Judge O'Brien denied the motion on May 3, 1982 (Docket #9, Commonwealth's Exhibit 55).

The case then returned to the Supreme Court of Pennsylvania, which affirmed the denial of relief on July 2, 1982.  That court also reinstated the conviction for conspiracy, finding that the Superior Court erred in granting Goldblum relief in this respect (Docket #9, Commonwealth's Exhibit 57).  Goldblum's subsequent application for reargument was denied on December 9, 1982, and this concluded Goldblum's direct appeal in the state courts.

Goldblum next filed a Post Conviction Hearing Act (PCHA) petition on March 7, 1986, represented by Robert Potter, Esquire.  Eight claims were raised, including the following:

1.  My rights to Due Process under U.S. Constitution and the Constitution of Pennsylvania were violated when the courts of Pennsylvania denied my motion for a new trial on the basis of after discovered evidence which demonstrated that Clarence Miller, the chief prosecution witness who testified against me, suffered from brain damage which rendered him unable to distinguish between truth and falsity and which caused him to fabricate or confabulate his testimony.

2.  My rights to Due Process under the U.S. Constitution and the Constitution of Pennsylvania were violated by the joint operation of two rules of state criminal procedure.

\*   \*   \*

6.  My conviction by the Jury of first degree murder is inconsistent with the incontrovertible physical facts and evidence introduced at trial.

7.  The Commonwealth deprived me of Due Process under the U.S. Constitution and the Pennsylvania Constitution when it asserted inconsistent positions in judicial proceedings with respect to the testimony of its chief witness, Clarence Miller.

(Docket #9, Commonwealth's Exhibit 60).  Judge O'Brien denied the petition without a hearing on June 23, 1986, and in doing so relied upon the testimony taken at a hearing held during remand on direct appeal (Docket #9, Commonwealth's Exhibit 61).

On appeal from the denial of PCHA relief, Goldblum argued, inter alia, that the denial of his pretrial request to have Clarence Miller examined by a psychiatrist, coupled with the denial of the motion for a new trial on the basis of the after-discovered evidence of Miller's mental condition, denied him Due Process.  Superior Court affirmed on February 2, 1988 (Docket #10, Commonwealth's Exhibit 65).  A subsequent petition for allowance of appeal was denied by the Supreme Court of Pennsylvania.

14

Goldblum, again represented by Attorney Potter, filed a petition for writ of habeas corpus in this court which was docketed at Civil Action No. 89-1493.  In that petition, he presented the following two claims:

> 1. Whether the denial of [Goldblum's] pretrial application for psychiatric examination of the prosecution's only eyewitness, coupled with the denial of his motion for new trial based on after discovered evidence providing a basis for attacking the credibility of that witness, together denied petitioner due process under the Fourteenth Amendment.
>
> 2. Whether the admission into evidence of the out-of-court declarations of Wilhelm that petitioner had participated in the land fraud and that Wilhelm had participated in the arson of petitioner's restaurant deprived him of his right to confront the witnesses against him guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

(Docket #16 at Civil Action No. 89-1493, pp. 16, 24).   The Magistrate Judge's Report and Recommendation, ultimately adopted by the Court as its opinion, contains the following relevant analysis concerning the two issues presented:

> The weakness in petitioner's due process argument is that the psychiatric and psychological evidence he wanted to present at a new trial would merely corroborate the more compelling evidence of Miller's lack of credibility which had been presented during his trial. Most telling was Miller's admission that he lied when he was nervous. (Tr. 995-995)[sic]. Further, the jury was presented with Miller's contradictory stories which revealed that he had lied to the police.  At first he denied involvement.  During the trial he admitted that during the Coroner's Inquest he had testified that he did not know petitioner intended any violence toward Wilhelm when he lured him to the parking garage. (Tr. 956).  During the trial he testified that he lured Wilhelm to the parking garage so that Goldblum could beat him up.  Finally, Miller admitted that he had executed a false affidavit.
>
> The jury was presented with clear evidence that Miller was not a credible witness.  That evidence was much stronger than the proffered testimony of Dr. Merikangas and Dr. Van Cara.  Therefore, the denial of petitioner's motion for a new trial on the ground of newly discovered evidence did not deprive him of due process in violation of the Fourteenth Amendment to the United States Constitution.

15

(Id., pp. 23-24).  With respect to the second issue raised, the Magistrate Judge concluded that the challenged out-of-court declarations from the decedent were admissible under federal law and, hence, no constitutional violation occurred[6]. (Id., at 29-31).  Goldblum's subsequent appeal to the United States Court of Appeals for the Third Circuit resulted in that court affirming without opinion on November 26, 1991 (Docket #11, Commonwealth's Exhibit 78).  The Supreme Court of the United States denied Goldblum's Petition for Writ of Certiorari on April 22, 1992.

Goldblum again resorted to the state courts, filing a motion seeking discovery in September, 1995, which the Commonwealth opposed due to the lack of any pending collateral appeal.  On January 12, 1996, Goldblum filed a pro se petition under the Post Conviction Relief Act (PCRA), and this was followed by a counseled, amended petition on January 16, 1996.  The following claims were raised[7]:

> (a)    Whether the prosecution, in violation of the Sixth and Fourteenth Amendments, death qualified Goldblum's jury to improperly enhance its chances of obtaining a conviction, even though the case was not one for which the death penalty was appropriate;

> (b)    After-discovered evidence in the form of forensic proof relative to blood spatter evidence that Goldblum could not have been the assailant;

---

[6]    The statements at issue were Miller's testimony that Wilhelm admitted to him that he had been involved in the arson occurring at Goldblum's restaurant and had called Goldblum's office pressuring Goldblum for payment (which was confirmed to some extent by another witness who took a call at Goldblum's office from a person identifying himself as "the torch"), and witness William Hill's testimony that Wilhelm mentioned Goldblum's name in connection with Wilhelm's attempt to purchase land prior to the time when Goldblum said he first met Wilhelm.

[7]    The PCRA petition is somewhat free-flowing.  Set forth above is the description of the claims as contained in Goldblum's present petition which accurately, and more concisely, describes the issues raised in the amended PCRA petition.

16

(c)  After-discovered evidence relative to Clarence Miller's post trial statements in which he confesses to being the killer;

(d)  The sentencing Court's imposition of restitution on Goldblum in the absence of required findings of fact relating to Goldblum's ability to pay, in violation of Goldblum's rights to due process of law;

(e)  The ineffectiveness of Goldblum's trial counsel and previous appellate counsel in violation of Goldblum's Sixth Amendment right to effective counsel, said ineffectiveness being described as follows:

   1.  Counsel's failure to challenge and preserve the issue of the prosecution's inability or unwillingness to consider evidence establishing that Goldblum could not have murdered George Wilhelm;

   2.  Counsel's failure to challenge and preserve the issue of the prosecution's fatally defective and inadequate crime scene and forensic investigation;

   3.  Counsel's failure to elicit the advice and testimony of Dr. Cyril Wecht who would have testified that Goldblum could not have been the assailant in this murder based on physical evidence;

   4.  Counsel's failure to properly challenge and preserve the death qualified jury issue;

   5.  Counsel's failure to pursue and preserve the issue of the legality of the restitution component of Goldblum's sentence;

   6.  Counsel's failure to conduct an independent investigation which would have established that Goldblum did not commit the murder of George Wilhelm;

   7.  Counsel's failure to pursue a line of questioning and investigate Clarence Miller's psychiatric history.

(Docket #1 at 8-9).  Filed in support of this petition was an affidavit from Dr. Wecht in which he reviews his qualifications as a forensic pathologist, states that he was available for consultation and/or testimony at the time of Goldblum's trial, and makes the following additional statements:

17

9. It is absolutely essential for defense counsel to consult with a pathologist and/or criminalist in a homicide case involving multiple defendants who each deny committing the murder. Even if the prosecution's theory of the case cannot be ruled out as an impossibility from a physical or temporal standpoint, the pathologist can be used to determine if there are one or more alternative scenarios, thereby establishing a question of reasonable doubt.

\* \* \*

20. Based upon my review and analysis of the autopsy report prepared by this office on February 10, 1976, numerous police and other investigative reports and statements and various court documents, I have concluded to a reasonable degree of medical certainty that Mr. Goldblum was not the individual who inflicted the fatal stab wounds to Mr. Wilhelm.

21. My opinion in this matter is based upon a number of factors. Initially, the presence of blood spatters on the dashboard of Mr. Wilhelm's car establishes that the stabbing began while he was in the car. Mr. Miller's testimony that no stabbing occurred until the victim fled the car is directly contradicted by this physical evidence.

22. Mr. Wilhelm was sitting in the driver's seat; Mr. Miller was in the front passenger seat, and Mr. Goldblum was in the rear seat. As the blood spatters were in front of the victim, not behind him, it is more likely than not that he was stabbed by someone in front of or immediately to the side of him. Given the relative position of the parties, the physical evidence points to Mr. Miller as being the person who stabbed Wilhelm while in the car.

23. The pattern of blood distribution on the dashboard evidenced a left to right movement. This pattern is consistent with and establishes that Mr. Wilhelm was stabbed by the person to his right - Clarence Miller.

24. Several of Mr. Wilhelm's stab wounds were quite serious, His left jugular vein was cut, his liver was punctured, the left lung was penetrated, and aorta was cut. The bleeding caused by these wounds was massive. The chest cavity was found to contain 1,500 cc of blood (about 1½ quarts). The abdominal cavity contained 1,006 cc of blood (about 1 quart).

25. Given the number and severity of the stab wounds, it is unimaginable to me that Mr. Wilhelm's assailant would not have gotten a significant amount of blood on his clothes. Yet, Mr. Wilhelm's blood was not found on the clothes seized from Mr. Goldblum. Mr. Miller, however, admitted that he had attempted to dispose of his own clothes which had become stained with Wilhelm's blood.

18

26.     Additionally, Mr. Miller testified that Mr. Goldblum wore his gloves while committing the murder.  The only person that has been linked to the gloves through scientific evidence is Miller himself.

27.     Finally, I have considered the dying declaration of the victim. George Wilhelm identified Clarence Miller as his murderer before he died. The law puts great weight on such statements as there is a strong presumption that someone about to die will truthfully identify his killer.  In this case, the forensic evidence supports Mr. Wilhelm's dying declaration.

(Docket #11, Commonwealth's Exhibit 85).  Additional expert affidavits to the same general effect from Michael Baden, M.D., and Barbara C. Wolf, M.D., were also filed by Goldblum.  At this point, the trial court also heard argument on the still-pending motion seeking discovery, which was premised upon alleged missing police files.  On July 9, 1996, the District Attorney's Office of Allegheny County turned over copies of all police reports, supplemental reports and photographs in the office's possession.

After a response by the Commonwealth and a reply from Goldblum, Judge O'Brien filed a notice of intention to dismiss the petition without a hearing, finding that all of the claims raised had either been previously litigated or could "no longer be considered due to the passage of time." (Docket #11, Commonwealth Exhibit 90).  This prompted Goldblum's counsel to file numerous transcripts which were generated during civil proceedings concerning the missing police files (Docket #s 11 and 12, Commonwealth Exhibits 92-98).  Goldblum responded to the notice of intent to dismiss, and also moved to amend his petition, asserting trial counsel's ineffectiveness for failing to object to the trial court's instruction on accomplice liability (Docket #12, Commonwealth's Exhibit 100). Judge O'Brien dismissed the petition on February 12, 1997, for the reasons contained in the notice of intent to dismiss (Docket #12, Commonwealth's Exhibit 101).

On appeal to the Superior Court, and now represented by present counsel Markovitz and Eyster, Goldblum raised the following claims:

I.        Whether the PCRA court erred in denying Goldblum's PCRA petition without an evidentiary hearing?

II.       Whether Goldblum is entitled to relief under the PCRA on the basis of ineffective assistance of counsel for the following reasons: (A) Counsel's failure to adequately investigate the murder and call expert witnesses at trial who would have established that Goldblum was not the killer of Wilhelm; (B) Counsel's failure to request evidence under Brady v. Maryland; and (C) Counsel's failure to request a missing evidence instruction?

III.      Whether Goldblum is entitled to relief under the PCRA on the basis of ineffective assistance of trial counsel for failing to object to an improper and prejudicial accomplice charge?

IV.      Whether Goldblum is entitled to relief under the PCRA on the basis of after-discovered evidence [including a statement by Miller that he was in jail for killing a man who asked too many questions]?

V.       Whether Goldblum is entitled to relief under the PCRA due to prosecutorial misconduct which consists of the following: (1) Police failure to preserve evidence; (2) Police destruction of the evidence; (3) the Commonwealth's death-qualifying the jury; (4) the Commonwealth's knowing use of perjured testimony; and (5) post-trial destruction of evidence?

VI.      Whether the claims presented by Goldblum below and on appeal are not waived because he is innocent of first-degree murder and because counsel was ineffective for failing to properly raise those claims previously?

(Docket #12, Commonwealth Exhibit 106 at 3, 53).  The Superior Court filed an opinion on August 13, 1999, finding all claims waived, previously litigated or meritless, save for the claim that counsel was ineffective for failing to call Dr. Wecht as a witness at trial (Docket #12, Commonwealth's Exhibit 117).   As to this claim, a remand for an evidentiary hearing was ordered[8].   The

_____

[8]        Specifically, the Superior Court held:

Appellant has provided an affidavit of Dr. Wecht, who was available to testify at the time of trial, in which Dr. Wecht states that, based upon his

Commonwealth sought review in the Supreme Court of Pennsylvania, but its petition was denied, permitting the remand to occur.

On remand, Goldblum again sought to amend his petition, this time to include an express challenge to his convictions for the crimes of theft by deception and solicitation to commit arson (as the original petition challenged only the murder count). Likewise, Goldblum sought to omit certain claims which had already been litigated, and to include an after-discovered evidence claim which arose subsequent to the filing of the initial petition (Docket #13, Commonwealth's Exhibit 125). The after-discovered evidence referred to consisted of the statements made by Miller to Butler County Jail Warden Richard Gigliotti and then Pennsylvania Attorney General D. Michael Fisher in April, 1999, which claim had been included in Goldblum's brief in Superior Court.

A hearing was held before the Honorable Donna Jo McDaniel (Judge O'Brien had since retired from the bench) on October 18 and 19, and concluding on December 18, 2000. The first witness at the hearing was trial counsel H. David Rothman, Esquire. Mr. Rothman stated that he did not conduct an independent investigation of the crimes, and specifically with respect to the blood spatter evidence, because "the police did not photograph and preserve the blood spatters that were found on the dashboard of Mr. Wilhelm's car. And so, I had to rely on what the police were saying they saw . . .." (Id., at 13-14). The theory of the defense was that Goldblum was innocent of all charges. "Clarence Miller's credibility was very suspect as to who committed the actual stabbing of

_____

study of the available forensic evidence in this case, he has "concluded to a reasonable degree of medical certainty that Mr. Goldblum was not the individual who inflicted the fatal stab wounds to Mr. Wilhelm." Since the PCRA petition filed by appellant presented a "genuine issue concerning [a] material fact", we are obliged to find that the trial court erred when it disposed of the instant petition without holding an evidentiary hearing.

(Docket #13, Commonwealth's Exhibit 117 at 8).

21

Mr. Wilhelm.  The physical evidence tended to establish that Mr. Miller did the stabbing." (Id., at 15).

In Rothman's judgment, the cross-examination of Miller went well.  Also, other witnesses established

that Miller had blood on his coat, while Goldblum did not have blood on his clothes, and the victim

specifically identified only Miller in his dying declaration (Id.).  Rothman also suggested an additional

defense which would have Goldblum guilty of involuntary manslaughter but not first degree murder,

but Goldlblum refused to allow it to be presented (Id., at 16).

Rothman did not consult a criminalist or a pathologist prior to trial.  The literature he

consulted indicated that blood spattering was an unreliable source for reaching a conclusion

concerning who stabbed Wilhelm (Id., at 17).  And, with the manner in which the parties were seated

in the car, "it was certainly possible that either Miller or Goldblum could have done the stabbing."

(Id., at 18)[9].  Rothman decided, therefore, to argue the circumstantial evidence which pointed to Miller

rather than pursuing an expert who, in Rothman's view, would not have been able to prove one way

or the other who stabbed Wilhelm (Id., at 19).  Thus, Rothman argued to the jury that all of the

physical evidence pointed to Miller having done the actual stabbing, including the "frank and honest"

testimony of the investigating officer who conceded that the blood spatter on dashboard went in a

direction towards Miller (Id., at 22).

The hearing continued the following day and Dr. Wecht testified.  Although he was

Allegheny County Coroner at the time of George Wilhelm's death in 1976, he had no involvement in

the case as his assistant, Dr. Perper, handled the autopsy (Id., at 40).  Dr. Wecht's testimony was

consistent with his earlier-filed affidavit and, hence, it will be described further here only to the extent

---

[9]     Interestingly, this is the same conclusion which Dr. Wecht would later testify to, i.e., that it
was possible [though not likely] that Goldblum did the stabbing from the back seat.

that his testimony clarified or expanded upon that affidavit.  Dr. Wecht was directed to page 1247 of

the trial transcript, which contained the following testimony from Detective Ron Freeman concerning

the blood spatter on the dashboard of the Wilhelm car:

> What I saw there were a small line of blood droplets, and it was not a lot of blood there, but they were discernable droplets and they started on the – toward the driver's side was the largest spot, and then they descended into smaller circles, and each circle has what is called "a tail" and the "tail" was facing toward the passenger side of the automobile and that indicated that blood came from left to right, as I faced it or traveled from the driver's side of the automobile to the passenger's side of the automobile.

(Trial Transcript, hereafter "Tr.," at 1247)[10].  This is the full extent of the evidence presented at trial,

and is the full extent of the evidence available to Dr. Wecht and the other proposed defense experts,

concerning the blood on the dashboard of the vehicle.  Dr. Wecht then voiced his opinion:

> It is my opinion, based upon the forensic scientific evidence, the physical evidence **and other related information** in this case from my perspective as a forensic pathologist that Mr. Goldblum was not the individual who stabbed Mr. Wilhelm on this occasion.

(Transcript of October 18-19, 2000 at 45)(emphasis added).  Dr. Wecht opined that part of his opinion

was premised upon the lack of blood on Goldblum's clothes, and the presence of blood on Miller's

(Id., 46).  Likewise, gloves found at the scene had hairs consistent with Miller's arm hair, but had

nothing to indicate that Goldblum wore them (Id.).  Fresh scratches on Miller's face, as observed by

---

[10]   Freeman's description occurred during direct examination.  On cross-examination, defense counsel Rothman first established that no photographs of the dashboard had been taken (Tr. 1248).  He then obtained from Freeman a further description of the position of the blood, i.e., Freeman described the blood as beginning in thicker dots just onto the passenger half of the dashboard, and trailing in smaller dots as it went further towards the passenger side  (Tr. 1231).  Detective Freeman testified that he did not expect this could have been deposited from an injury caused to the back of Wilhelm's head from a wrench (the weapon Goldblum was alleged by Miller to have used to hit Wilhelm), and that there was no blood on the wrench in any event (Tr. 1252-53).  Further, Detective Freeman testified that, had Wilhelm been stabbed in the car, the blood could have come from the weapon used to stab him (Tr. 1253).

investigating officers the day after the assault, were also considered by Dr. Wecht in reaching his conclusion (Id., at 47).  As to the blood spatter on the dashboard, Dr. Wecht found, premised upon Detective Freeman's description at trial, as well as the type of wounds suffered by Wilhelm:

> The significance of these wounds are entirely consistent with and buttress and support the conclusion that a person sitting to the left of Mr. Wilhelm [Clarence Miller's position] is wielding the instrumentality.

(Id., at 49).  Dr. Wecht also testified that such testimony from him concerning blood spatter would have been available to counsel in 1977 (Id., at 53).  Dr. Wecht opined, on the basis of the number and severity of wounds, that he "would **definitely lean toward** one individual inflicting all of the wounds." (Id., at 56) (emphasis added).

On cross-examination, Dr. Wecht conceded that the scratches to Miller's face were not as important as other evidence, particularly since fingernail scrapings of the victim were done in this case, and they came back negative (Id., at 59-60).  Further, in interpreting the meaning of blood being cast or spattered, Dr. Wecht conceded that the type of "medium velocity cast off" described is more difficult to obtain in a car than it would be in a less restrictive area (Id., at 64).  Dr. Wecht testified that it was possible, but unlikely, that blood from a bloody nose could leave the single trail of cast-off in question (Id. at 65), that cast-off from one of the numerous defensive wounds to Wilhelm's hand could not be physically excluded, although it would not "seem to be very likely" (Id.).  Instead, Dr. Wecht testified that it was "more likely" that the blood came from the shear blade after a stab wound had been inflicted.  He described the "scenario I deem most plausible" as the wounds being inflicted by the person in the front passenger seat (Id., at 68).

Dr. Wecht agreed that Wilhelm's dying declaration is not forensic evidence (Id., at 68-69).  Although the testimony at trial contained a description of blood on the inside of the rear driver's

side window, next to where Goldblum was seated, Dr. Wecht did not find this significant (Id., at 76). Further, the blood on the dashboard could not be typed and, therefore, Dr. Wecht's conclusions could not be based upon any certainty concerning whose blood it was (Id., at 77-78).

Dr. Wecht also agreed that the blood spatter could have occurred if Goldblum had leaned over the front seat and stabbed Wilhelm, bringing his arm back to his right for another swing (Id., at 79). Again, he considered that this was not likely to have occurred because he saw "no reason why such gyrations would be necessary," (Id.). Dr. Wecht testified that he had no way of knowing if either Miller or Wilhelm sustained a bloody nose during the struggle that Goldblum himself described as occurring in the front seat of the car (Id., at 80-81).

As to the absence of blood on Goldblum's clothing, Dr. Wecht agreed that wearing clothing over top of existing clothing, as Goldblum was said to have done, would be one possible explanation. He also stated that one would "more often than not" find hair from the man who wore a pair of gloves, but that such hair would not always be present (Id., at 85-86).

On redirect examination, Dr. Wecht found the absence of blood on the ceiling or rear of the vehicle "quite inexplicable" if Goldblum had stabbed Wilhelm from the back seat (Id., at 93-94). Further, one would expect to find dripping from a bloody nose where the recipient thereof was seated, and no such evidence exists in this case (Id., at 94-95).

Judge McDaniel refused to take additional testimony from other forensics experts who agreed with Dr. Wecht's opinion, and from an expert in police investigations who would have commented upon the lack of photographs of the dashboard and other matters [11]. The defense also

---

[11] This included proposed testimony from a Mr. Balschy that "had the dashboard fluid been properly photographed against the measurement scale that information in conjunction with the uncontested position of the individuals in the vehicle would have developed a precise and conclusive determination as to who stabbed Mr. Wilhelm inside his vehicle." (Id, at 105). Mr.

offered an attorney as an expert witness on actions counsel should have taken to investigate this case prior to trial.  The court refused to hear these witnesses, and interpreted the scope of the remand order from Superior Court as limited to a hearing concerning counsel's failure to call Dr. Wecht at the time of trial.

On December 18, 2000, over defense objection, testimony was taken from a rebuttal witness presented by the Commonwealth, Toby Wolson, who is a forensic biologist employed by the Miami Dade Police Department (Hearing Transcript of December 18, 2000 at 5).  He testified as a bloodstain pattern analyst.  He has extensive training in analyzing blood patterns, and has also conducted "many, many" experiments in the area as, in his view, the only way to interpret a blood pattern is "through physical experimentations using blood." (Id., at 6-7).

Mr. Wolson found the description of the blood on the dashboard of the Wilhelm car "limited" in that it provides no information concerning any possible change in shape of the drops, which would more clearly indicate the flight path of the blood, and the arc of the weapon (assuming that it was cast off blood) (Id., at 19-20).  Such interpretation is impossible absent an independent view of the blood pattern (Id., 21) and, hence, no reasonable scenario could be ruled out, and any conclusion is "hypothetical" (Id., at 23-24).  In fact, it was Mr. Wolson's opinion that no conclusion to a reasonable degree of scientific certainty can be reached concerning who did the stabbing, or even if the stabbing actually began in the car (Id., at 25).

---

Balschy's proposed testimony in this respect would seem to support the Commonwealth's rebuttal witness, and the court's ultimate ruling in this case concerning the ability of Dr. Wecht to offer a definitive opinion absent photographic evidence of the blood spatter.

The hearing concluded after Mr. Wolson's testimony, and PCRA relief was thereafter denied.  In an opinion dated August 22, 2001, Judge McDaniel found as follows concerning the issue remanded to her by the Superior Court:

> Further, this Court is mindful that no photographs or other evidence of the blood stain existed.  The testimony of both Dr. Wecht and Mr. Wolson was premised on the fact that Detective Freeman's brief description of the blood stain was accurate.  A review of the testimony presented indicated that both experts were hesitant to declare their feelings absolute without being able to see the blood stain in question.  **Although the experts did make tentative findings, their testimony essentially amounted to speculation due to their inability to make conclusive findings.**

(Docket #13, Commonwealth's Exhibit 133 at 4)(emphasis added).

Goldblum filed an appeal and raised therein the following claims:

I.       Did the PCRA court err in denying relief in this case?

II.      Is Charles Goldblum entitled to relief under the PCRA on the basis of ineffective assistance of trial counsel for trial counsel's failure to adequately investigate the murder and consult with and call expert witnesses at trial who would have established that Goldblum was not the killer of Wilhelm?

III.     Did the PCRA court err in refusing to allow Goldblum to call his expert witnesses (other than Dr. Cyril Wecht), or to present his case?

IV.      Did the PCRA court err in allowing the Commonwealth to present the testimony of their expert, Toby Wolson, because his testimony was not relevant and was not available at the time of trial?

V.       Did the PCRA court err in refusing to allow Goldblum to call witnesses in surrebuttal, including Dr. Henry Lee, Dr. Michael Baden, Dr. Barbara Wolfe, John Balshy, F. Peter Dixon, Esquire, and Herbert Leon MacDonell?

VI.      Did the PCRA court err in refusing to allow petitioner to amend his petition, or the caption thereof, to include other charges tried with the homicide?

VII.     Did the PCRA court err in refusing to allow Goldblum to present his claims for relief based on after-discovered evidence and refusing to hold a hearing thereon?

(Docket #14, Commonwealth's Exhibit 135).  The Superior Court affirmed the denial of PCRA relief on October 24, 2002, agreeing with the trial court's analysis of the allegations of ineffectiveness with respect to Dr. Wecht's testimony.  Specifically, the Superior Court concluded that, due to the "fundamentally inconclusive" nature of Dr. Wecht's opinion, the court could not conclude that the outcome of trial would have been different had Dr. Wecht testified (Docket #14, Commonwealth's Exhibit 138 at 11).

The Superior Court also found that the lower court correctly excluded other proposed defense witnesses.  It found Wolson's testimony appropriate in that Dr. Wecht conceded the possibility that the killer could have stabbed Wilhelm from the back seat, and Wolson's testimony was related to the issue of whether Wecht's testimony would have produced a different result at trial (Id., at 12).  The court also rejected the after-discovered evidence claims as having been previously litigated or, in the case of the statements made to Warden Gigliotti, merely additional evidence concerning Miller's credibility (Id., at 14)[12].

Goldblum then filed a petition for allowance of appeal in the Supreme Court of Pennsylvania which was denied on May 20, 2003.  A Petition for Writ of Certiorari was filed with the Supreme Court of the United States on August 14, 2003, and was denied on January 12, 2004.  On February 26, 2004, Goldblum filed a motion in the United States Court of Appeals for the Third Circuit seeking permission to file a second or successive petition for writ of habeas corpus.  The Court of Appeals granted the petition on March 29, 2004.

---

[12]     The issue of the statements made by Miller to Warden Gigliotti was first raised in the motion to amend before Judge McDaniel.  She denied relief, thereby implicitly rejecting this claim. Superior Court's ruling that the evidence was, at most, impeachment evidence and cumulative of other such evidence presented is the applicable state court rationale offered for rejecting this claim.

The instant petition was filed, pursuant to the Court of Appeal's order, on April 2, 2004 (Docket #1). The claims raised in the petition appear at paragraphs 60 and 61, and are somewhat unwieldy and repetitive (Id., at 22-24). Counsel for petitioner have, helpfully, recast the claims in the context of the reply memorandum filed in support of the habeas petition:

1.    Trial counsel (as well as successor state counsel) were ineffective for failing to investigate, preserve and produce vital scientific evidence of blood spatter that would have proven that the Commonwealth's principal witness, Clarence Miller, was the person who stabbed and killed the victim, Mr. Wilhelm.

2.    Trial counsel (as well as successor state counsel) was ineffective for failing to object to the state trial court's erroneous and prejudicial instruction regarding accomplice liability. Specifically, there was no objection to (a) the trial court's failure to instruct the jury that it could not find petitioner as an accomplice unless they found beyond a reasonable doubt that petitioner acted with the specific intent to kill in acting as an accomplice or (b) the trial court's instruction to the jury that Clarence Miller was an accomplice of petitioner.

3.    The trial court's instruction to the jury on accomplice liability was constitutionally flawed and deprived petitioner of due process of law.

4.    The Commonwealth's loss and/or destruction of the investigative files was done intentionally and with the purpose of depriving petitioner of evidence that would support his legal claims, including his claim of innocence, all in violation of petitioner's right to due process of law.

5.    Newly discovered evidence regarding the Commonwealth's principal witness, Clarence Miller, provides strong proof that petitioner is innocent of the crime of murder and that the conviction was based on perjured testimony. Mr. Miller has admitted stabbing the victim and, while he continues to insist that petitioner was also involved, his admissions to a Warden and the State Attorney General are entirely inconsistent with his trial testimony, and are supportive of petitioner's claims of innocence. In these circumstances, this evidence provides grounds for a new trial on grounds of due process of law.

6.    The state courts failed to provide petitioner with a full and fair post-conviction hearing on these claims and thereby denied him due process of law.

(Docket #36 at 2-3).

**B.      AEDPA's Gatekeeping Requirement and the Court of Appeal's Order.**

The fact that this is a second petition for writ of habeas corpus, and that it has been filed with the Court of Appeals' permission, merits some discussion of the means by which this occurred, i.e., the gatekeeping mechanism enacted by Congress pursuant to the Anit-Terrorisim and Effective Death Penalty Act of 1996 (AEDPA) and contained in 28 U.S.C. §2244.  The Court of Appeals for the Third Circuit recently had occasion to restate the import of Section 2244:

> Section 2244, a provision of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), establishes the procedural and substantive requirements which govern "second or successive" habeas petitions. See In re Minarik, 166 F.3d 591, 599-600 (3d Cir.1999).  As a procedural matter, § 2244(b)(3)(A) establishes a "gatekeeping" mechanism that requires a prospective applicant to "file in the court of appeals a motion for leave to file a second or successive habeas application in the district court." Felker v. Turpin, 518 U.S. 651, 657, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996).  Once a petitioner moves for authorization to file a second or successive petition, a three-judge panel of the court of appeals must decide within thirty days whether there is a **prima facie showing** that the application satisfies § 2244's substantive requirements. 28 U.S.C. § 2244(b)(3)(D).

Benchoff v. Colleran, 404 F.3d 812, 816 (3d Cir. 2005)(bold type added).  Here, since Goldblum has already filed a petition for writ of habeas corpus which was addressed on its merits in 1989, his counsel filed an application with the Court of Appeals seeking permission to file a second or successive petition.  As detailed in footnote 1, the petition was granted on March 29, 2004. As noted above, the governing standard requires the Court of Appeals to determine, as a procedural matter, and on a limited record, whether the petitioner has made a "prima facie showing" that the petition "satisfies the requirements" for considering claims not raised in a prior petition. 28 U.S.C. §2244(b)(3)(C).

The "requirements" referred to are that the claim not previously raised meet one of two descriptions: (1) it is premised on a new rule of constitutional law made retroactive; or (2) it is premised on a factual predicate that could not have been discovered previously, and such facts, if proven, would establish by clear and convincing evidence that no reasonable fact finder would have convicted petitioner. 28 U.S.C. §2244(b)(2)(A-B). The Court of Appeals, therefore, was required to determine only if such a prima facie case had been established. It did so, but did not indicate whether that prima facie case was established as to one or more of the several claims raised by petitioner. Absent any indication to the contrary, this Court must assume that the Court of Appeals found a prima facie showing with respect to each of the claims presented by petitioner.

However, having met his prima facie case before the Court of Appeals, petitioner has satisfied only the procedural requirement of §2244. As the opinion in <u>Benchoff</u> makes clear, petitioner must still satisfy the "substantive standard" of §2244(b)(2) in order to obtain review of the merits of any particular claim:

> Section 2244(b)(2) provides the relevant substantive standard, which requires the dismissal of a "second or successive" habeas application unless:
>
> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.
>
> **Unless both the procedural and substantive requirements of § 2244 are met, the District Court lacks authority to consider the merits of the petition.**

31

404 F.3d at 816 (Emphasis added).  Hence, even though Goldblum has convinced the Court of Appeals that he should be permitted to file the instant petition, Goldblum still bears the burden of establishing before this Court that his claims satisfy the substantive requirements of §2244(b)(2) before those claims may be addressed on their merits.  In this respect, the Commonwealth asserts that each of Goldblum's claims is barred by abuse of the writ either under §2244(b)(2), or under the pre-AEDPA abuse of the writ standard.

1.     <strong>Abuse of the writ.</strong>[13]

Before reviewing each claim for abuse of the writ the Court must first determine the appropriate standard to be applied, i.e., either the AEDPA standard, or the pre-AEDPA standard.  See, e.g., United States v. Roberson, 194 F.3d 408, 411 (3d Cir.1999) (application of AEDPA gatekeeping provision not impermissibly retroactive where pre-AEDPA abuse of the writ established), and In re: Minarik, 166 F.3d 591 (3d Cir.1999)(same).  In Minarik, the Court of Appeals addressed the appropriate standard to be applied where an initial habeas petition is filed pre-AEDPA, and a second or successive petition is filed post-AEDPA, as is the case here.  The Court noted that "the new substantive standards governing the allowance of second or successive applications are more rigorous than the pre-AEDPA standard developed by the courts interpreting the prior version of §2244." 166 F.3d at 595.  The Minarik Court concluded that there is no impermissible retroactive effect from application of the procedural standard, i.e., the process of applying to the Court of Appeals for permission to file a second or successive petition. Id., at 599-600.  However, with respect to the new substantive standard which the district court must apply, the Court found:

---

[13]     Normally, the first issue in any habeas case is the exhaustion of state court remedies, followed by procedural default, if applicable.  However, a properly raised abuse of the writ claim should be addressed as a "threshold" matter, even prior to consideration of the exhaustion of state court remedies. Wise v. Fulcomer, 958 F.2d 30, 35 (3d Cir. 1992).

> . . . if [petitioner] can show that he would have been entitled to pursue his
> second petition under pre-AEDPA law, then the <u>Landgraf</u> default rule prohibits
> applying AEDPA's new substantive gatekeeping provisions to bar his claims.
> In the absence of such a showing, however, applying those standards to
> [petitioner] results in no genuine retroactive effect, and the AEDPA standard
> must be applied under the Supreme Court's holding in <u>Lindh</u> that AEDPA's
> habeas corpus amendments apply generally to cases filed after its effective
> date.

<u>Id</u>., at 602.  And, of course, the fact that AEDPA has imposed new restrictions on a state prisoner's

ability to file second or subsequent habeas petitions does not affect the traditional abuse of the writ

analysis to be applied:

> In short, AEDPA dealt with habeas petitions under § 2254 and § 2255 by
> building on <u>McCleskey</u> rather than supplanting it. Moreover, the Supreme
> Court has made it clear that, even with respect to abuse of the writ scenarios
> not governed in terms by AEDPA, its provisions 'certainly inform [judicial]
> consideration.' <u>Calderon v. Thompson</u>, 523 U.S. 538, 558, 118 S.Ct. 1489, 140
> L.Ed.2d 728 (1998) (quoting <u>Felker</u>, 518 U.S. at 663, 116 S.Ct. 2333). <u>See also</u>
> <u>In re Dorsainvil</u>, 119 F.3d 245, 251 (3rd Cir.1997).

<u>Zayas v. INS</u>, 311 F.3d 247, 251 (3d Cir. 2002).

The <u>Minarik</u> Court first addressed abuse of the writ under the pre-AEDPA standard,

and, having determined that all claims were barred under that standard, then went on to determine

whether the claims were also barred under AEDPA's new standard.  The Court noted that the opposite

approach is also acceptable.  "One approach to resolving these contentions would be to address the

issue of compliance with AEDPA at the outset." 166 F.3d at 608.  Indeed, the Court in <u>Minarik</u> chose

to do the AEDPA analysis second because it was addressing an issue of first impression (retroactivity

of AEDPA's gatekeeping provision).  Here, since that issue has been decided, the undersigned

believes it would be more beneficial to address AEDPA's standard first.

**2.      Abuse of the writ under AEDPA.**

Section 2244 of AEDPA first requires that issues be separated into those which were raised in a prior application for writ of habeas corpus, and those that were not. Section 2241(b)(1) mandates that a court must dismiss any claim which has been "presented in a prior application." In this respect, the present claim of newly-discovered evidence in the form of statements made by Clarence Miller (Goldblum's fifth claim) may be viewed as related to the claim made in the initial habeas proceeding that Clarence Miller's trial testimony was impeached by the evidence presented at Miller's own trial concerning his organic brain damage and inability to discern truth from fiction. While it is true that the specific evidence relied upon at this stage is different, i.e., it consists of new statements made by Miller to Warden Gigliotti, and those statements mark the first time that Miller admits to having participated in Wilhelm's murder, the fact of the matter is that this is yet another attempt to impeach Miller's credibility. As Magistrate Judge Sensenich reasoned with respect to the prior claim that after-discovered evidence concerning Miller's credibility required a new trial:

> The weakness in petitioner's due process argument is that the psychiatric and psychological evidence he wanted to present at a new trial would merely corroborate the more compelling evidence of Miller's lack of credibility which had been presented during his trial. Most telling was Miller's admission that he lied when he was nervous. (Tr. 995-995). Further, the jury was presented with Miller's contradictory stories which revealed that he had lied to the police. At first he denied involvement. During the trial he admitted that during the Coroner's Inquest he had testified that he did not know petitioner intended any violence toward Wilhelm when he lured him to the parking garage. (Tr. 956). During the trial he testified that he lured Wilhelm to the parking garage so that Goldblum could beat him up. Finally, Miller admitted that he had executed a false affidavit.

> The jury was presented with clear evidence that Miller was not a credible witness. That evidence was much stronger than the proffered testimony of Dr. Merikangas and Dr. Van Cara. Therefore, the denial of petitioner's motion for a new trial on the ground of newly discovered evidence did not deprive him of due process in violation of the Fourteenth Amendment to the United States Constitution.

(Docket #16 at Civil Action No. 89-1493, pages 16, 24).  Now, Goldblum sets forth an additional basis for challenging Miller's credibility.  This time it is an extra-judicial statement in which Miller admits that he participated in stabbing Wilhelm, but maintains that Goldblum also stabbed Wilhelm. Therefore, this claim of after-discovered evidence is not, as argued, newly-discovered evidence pursuant to AEDPA, nor it is an actual recantation by Miller.  It is, in fact, nothing more than Miller yet again giving a varying account of the murder, and is a second attempt to present evidence impeaching Miller's credibility (albeit is "new" impeachment evidence) and, as such, it must be dismissed as an abuse of the writ since such a claim has already been litigated in the prior habeas petition. See, e.g., Minarik, 166 F.3d at 608 (claim attacking knowing, intelligent and voluntary nature of guilty plea barred under §2244(b)(1) even where it is premised on new factual basis).[14]

Indeed, as the undersigned noted at the outset, and as Judge Sensenich implicitly recognized, this case was tried as a swearing contest between the two people who were admittedly present when Wilhelm was murdered.  All relevant facts were before the jury, including: (1) Miller's lack of credibility as established by his changing story and other matters; (2) physical evidence linking Miller to the murder; (3) a general lack of physical evidence linking Goldblum; and (4) Wilhelm's dying declaration naming only Miller.  Adding additional reasons to doubt Miller's veracity would  not change the character of the case, and is certainly not enough to warrant habeas relief.

---

[14]   The Court will also analyze this claim under the second part of §2244(b) in the event that a reviewing court finds that the new factual basis for the claim removes it from the ambit of §2244(b)(1).

Prisoners are not entitled to release from custody simply because a witness against them has changed his story.[15]

Goldblum's remaining claims have not previously been raised in a federal habeas petition. Thus, §2244(b)(1) is not a bar to considering those claims, and the court must determine if the claims may be addressed under §2244(b)(2).

Section 2244(b)(2)(A) permits review of claims only if they are premised upon "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court." None of Goldblum's claims fit this description. Thus, his claims may not be reviewed under this provision.

Accordingly, the only means by which Goldblum could obtain review of his claims under AEDPA is pursuant to §2244(b)(2)(B) which requires proof of two things: (1) that the claim is premised upon a "factual predicate [which] could not have been discovered previously through the exercise of reasonable diligence" (§2244(b)(2)(B)(i); and (2) that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and

---

[15]     The analysis would be somewhat different if Miller had provided a recantation affidavit exonerating Goldblum. (Of course, the statement by Miller is not a recantation since he has not offered a sworn statement challenging his own testimony at trial, and it does not exonerate Goldblum.) Even true recantation evidence, is, however, not likely to result in the grant of a new trial. Pennsylvania has historically viewed recantation as "one of the least reliable forms of proof." Commonwealth v. McCracken, 540 Pa. 541, 659 A.2d 541, 545 (Pa.1995). Federal law is consistent with Pennsylvania's approach in that recanting affidavits and witnesses are viewed with "extreme suspicion" Spence v. Johnson, 80 F.3d 989, 1003 (5th Cir.), cert. denied, 519 U.S. 1012 (1996). Federal courts are directed to "compare the trial record with the affidavit of recantation and determine . . . whether the affidavit is worthy of belief" (Id., at 1003-1004). Miller's statements since the trial in this case to third parties, although inconsistent with his trial testimony are, as the state court noted, nothing more than additional impeachment evidence which, in light of the impeachment evidence actually presented at trial, do not warrant relief.

convincing evidence that, but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense" (§2244(b)(2)(B)(ii)).

None of Goldblum's claims meets the two-part standard of §2244(b)(2)(B). His first claim, that counsel was ineffective for failing to "investigate, preserve and produce" scientific evidence of blood spatter is certainly a claim which could have been discovered prior to the 1989 habeas petition. Indeed, Goldblum himself relies upon an expert who testified that he would have been available to testify concerning this evidence in 1977, and a claim concerning the use of blood spatter evidence was presented in Goldblum's 1986 PCHA petition in state court. Thus, this claim would be barred under AEDPA.[16]

Petitioner's next two claims are premised upon the allegedly erroneous jury instruction on accomplice liability. A challenge to the jury instruction was actually made during direct appeal

---

[16]   Goldblum asserts that certain of his claims, although "available" at the time of his prior habeas petition had not yet been litigated in the state courts and, accordingly, would have resulted in a "mixed petition" under Rose v. Lundy, 455 U.S. 509 (1982). He asserts, therefore, that his failure to raise then-unexhausted claims in his prior petition does not constitute abuse of the writ under AEDPA. This very argument, however, has been rejected by the Court of Appeals in Benchoff:

> We agree with the Fifth Circuit that *Rose v. Lundy* requires a petitioner to either fully exhaust all claims prior to filing a petition or to raise both exhausted and unexhausted claims in the first habeas petition. If Benchoff's parole claim was unexhausted, then *Rose v. Lundy* would require dismissal of the petition without prejudice [footnote omitted]. Benchoff could then have properly re-filed the petition once all of his claims were exhausted. This re-filed petition would not constitute a second or successive petition . . .. Rather than follow the procedure prescribed by *Rose v. Lundy* and its progeny, Benchoff chose instead to withhold his parole claim while he exhausted it in state court, rendering this petition "successive" under § 2244(b).

404 F.3d at 820. Therefore, the fact that state court remedies may not have been exhausted with respect to certain claims at the time the first habeas was filed does not save Goldblum from an abuse of the writ ruling with respect to those claims.

in state court, although the basis for that challenge is not as expansive as the present challenge. Further, and in any event, the jury instructions were clearly "discoverable" at all times after they were given.  There is no allegation that there has been a change in the law and, hence, the claim was discoverable long before the 1989 habeas petition.  Therefore, Goldblum's second and third claims are also barred under AEDPA.

Next, Goldblum asserts that the loss and/or destruction of police investigative file deprived him of due process.  This appears to be a matter which was not known to Goldblum prior to the 1989 habeas petition being filed and, accordingly, may fit the first part of the test.  However, the fact that the police file is now missing does not "establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense" since the absence of the file simply does not amount to exculpatory evidence in this case.[17]  Thus, this claim does not meet the second part of the test and, accordingly, is barred by §2244(b)(2).

In his fifth claim, Goldblum asserts that there is newly-discovered evidence that Clarence Miller did not testify truthfully at trial.  Indeed, Warden Gigliotti's recollection of Miller's newest version of events does tend to prove that Miller did not testify truthfully at trial and, hence, is impeachment evidence.  However, the evidence does not meet the second part of §2244(b)(2)(B)(ii)

---

[17]     Further, there is no allegation that the file was unavailable at the time of trial and all through direct appeal.  Thus, it is not as if Goldblum alleges that he has always been denied access to the police file.  Further, the investigative file was, in effect, reconstructed by the Commonwealth in the mid-1990's when the District Attorney turned over all evidence in its file to supplement what Goldblum already possessed.  Thus, there is no specific claim of prejudice here and, to the extent that any prejudice may have occurred, it occurred during collateral appeal, and was offset by the Commonwealth's attempt to reconstruct the police investigative file.

because, in light of the vast evidence of Miller's lack of credibility at trial, it would have been

cumulative only (See, infra, pp. 38-39).  And, even if believed, Miller's new statement would not

exonerate Goldblum, since Miller still maintains that Goldblum actively participated in the murder.[18]

Finally, Goldblum asserts that the state courts failed to provide a full and fair hearing

during PCRA proceedings, thereby denying him due process of law.  This is a "new" claim in that the

asserted constitutional deprivation occurred after the initial habeas action was concluded, and during

the most recent state court collateral appeal.  However, failure to grant as expansive a post-conviction

hearing as a petitioner requests does not rise to the level of a constitutional violation, and certainly

does not qualify as a matter which would affect the outcome of a trial held almost two decades earlier.

Thus, although the first part of the §2244(b)(2)(B)(ii) is met, petitioner cannot make a showing that

the outcome at trial would have been affected and, accordingly, AEDPA bars review of this claim.[19]

---

[18]     Also, as Judge McDaniel noted, there is no indication whether the jury found that Goldblum
had actually himself killed Wilhelm or whether the jury found that he was an accomplice to
Miller.  Thus, the statement is not in any way exculpate Goldblum.

[19]     Also, the underlying claim does not rise to constitutional magnitude and would be denied even
if addressed on its merits pursuant to the instant habeas petition.  Generally, asserted errors
in the course of a state's post conviction process simply are not cognizable in a federal habeas
petition. Bryant v. Maryland, 848 F.2d 492, 493 (4th Cir. 1988); Nichols v. Scott, 69 F.3d
1255, 1275 (5th Cir.1995) ("An attack on a state habeas proceeding does not entitle the
petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding
collateral to the detention and not the detention itself.") (internal quotation marks omitted);
Roe v. Baker, 316 F.3d 557, 571 (6th Cir. 2002) ("relief may not be granted to a habeas
petitioner for alleged deficiencies in a state's post-conviction procedure"); Jolly v. Gammon,
28 F.3d 51, 54 (8th Cir. 1994); Franzen v. Brinkman, 877 F.2d 26, 26 (9th Cir. 1989);
Hopkinson v. Shillinger, 866 F.2d 1185, 1219-20 (10th Cir. 1989), on reh'g, 888 F.2d 1286
(1989), overruling on other grounds recognized by Davis v. Maynard, 911 F.2d 415, 417 (10th
Cir.1990); Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir.1987).  Contra Dickerson v.
Walsh, 750 F.2d 150, 153 (1st Cir.1984).  The Court of Appeals for the Third Circuit has not
taken a position on this issue. Ferguson v. Delaware, No. 96-306-LON, 1996 WL 1056727,
at *12 (D. Del. Dec. 13, 1996), aff'd, sub nom., Hameen v. Delaware, 212 F.3d 226 (3d Cir.
2000), cert. denied, 532 U.S. 924 (2001). See also, Lambert v. Blackwell, 2003 WL1718511
(E.D.Pa., April 1, 2003)(persuaded by Eighth Circuit's analysis that such claims impact only

Therefore, all six of Goldblum's claims would be barred under AEDPA's gatekeeping requirement. The Court must next analyze each of the barred claims (save the last claim concerning a lack of a full and fair PCRA proceeding) under the pre-AEDPA standard to determine if there is a conflict and, hence, a retroactivity issue.[20] If the claims are barred under the pre-AEDPA standard as well, the issue is resolved. Claims (if any) which are not barred under the pre-AEDPA standard will be addressed on their merits.

### 3. Abuse of the writ under the pre-AEDPA standard.

Under the pre-AEDPA abuse of the writ standard, the government bears the burden of pleading an abuse of the writ, and must set forth the petitioner's prior writ history, and then identify the claims which were either raised in a prior petition, or not raised in a prior petition. Wise, supra at 34 note 8. Where the government offers a prior habeas proceeding as proof of abuse of the writ through presenting the same claim twice, the prior denial of a habeas petition is given controlling weight if:

> (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior applications, (2) the prior determination was on the merits and (3) the ends of justice would not be served by reaching the merits of the subsequent application.

---

the issue of exhaustion of state remedies); Abu-Jamal v. Horn, 2001WL1609690 (E.D.Pa., Dec. 18, 2001)(same). In the absence of mandatory authority, this court adopts the majority rule which renders alleged deficiencies in a state's post conviction proceedings non-cognizable in a habeas proceeding. See Ferguson, id. at 13 n. 3 (an action "that does not directly challenge the fact or duration of confinement, but instead disputes the constitutionality of state procedures designed to allow challenges to the fact or duration of confinement are more properly brought in a § 1983 action.")(citing Murray v. Giarratano, 492 U.S. 1, 3-4 (1989).

[20]   The Court will not further address the claim that the PCRA hearing was not "full and fair" as an independent claim for relief. (See footnote 19 regarding alleged deficiencies in state post-conviction proceedings).

Daniel v. Warden, 794 F.2d 880, 882-83 (3d Cir. 1986), quoting Sanders v. United States, 373 U.S.

1, 15-17 (1963).  Further, with respect to claims not raised in the prior proceeding, abuse of the writ

is established when there is inexcusable neglect on the petitioner's part in failing to raise those claims

in the prior petition. McCleskey v. Zant, 499 U.S. 467(1991).  The cause and prejudice standard

applicable to procedural default analysis is also applicable to cases where new issues are raised in a

second or subsequent habeas petition. Id. at 1470.  Cause for a default, or in this case, a failure to raise

a claim in a prior habeas proceeding, ordinarily turns on some external impediment to raising a claim.

Caswell v. Ryan, 953 F.2d 853, 862 (3d Cir. 1992); McCleskey, 499 U.S. at 493; Murray v. Carrier,

477 U.S. 478, 488 (1986).  Neither a deliberate strategic decision nor an inadvertent failure of counsel

to raise an issue constitutes "cause" unless counsel's performance failed to meet the Sixth Amendment

standard for competent assistance.  Engle v. Isaac, 456 U.S. 107 (1982); Carrier, 477 U.S. at 485-87.

"Prejudice" in this setting requires proof of "actual prejudice:"

> To demonstrate "actual prejudice," [a petitioner] must show "not merely that
> the errors at his trial created a *possibility* of prejudice, but that they worked to
> his *actual* and substantial disadvantage, infecting his entire trial with error of
> constitutional dimensions." United States v. Frady, 456 U.S. 152, 170, 102
> S.Ct. 1584, 71 L.Ed.2d 816 (1982).

Tillery v. Horn, 2005 WL 1793498 at 3 (3d Cir. July 29, 2005)(emphasis in original); Carrier, supra.

Finally, even if the cause and prejudice standard is not met, Goldblum may nonetheless

obtain review of "new" claims which satisfy the "fundamental miscarriage of justice" standard

described in Schlup v. Delo, 513 U.S. 298, 314-15 (1995); Minarik, 166 F.3d at 607;  McCleskey, 499

U.S. at 495.  This court may correct a fundamental miscarriage of justice if it appears that a

"constitutional violation probably resulted in the conviction of one who is actually innocent." Murray,

477 U.S. at 496.  See also Coleman, 501 U.S. at 748; McCleskey, 499 U.S. at 502.  Under the

"miscarriage of justice" standard, a petitioner must present evidence of innocence and persuade the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. Schlup, 513 U.S. at 315; Glass, 65 F.3d at 15. This is a stronger showing than is required to establish prejudice and is found only in a truly "extraordinary" case. Schlup, supra; Minarik, 166 F.3d at 607.

Goldblum's first claim, concerning counsel's alleged failure to investigate and present evidence concerning the blood spatter on the dashboard of the victim's car could have been raised at any time by the defense during direct appeal, the initial PCHA proceedings, or in the first habeas proceeding. It is clear that the basis for this claim clearly existed prior to the initial habeas proceeding in 1989. Goldblum asserts as "cause" for this failure to present the claim the ineffective assistance of prior counsel the fact that he had not, as of the time of the prior habeas petition, exhausted available state court remedies. As noted above, this is not sufficient to establish cause for the failure to raise the claim. Minarik, 166 F.3d at 604 (failure to exhaust state court remedies insufficient to establish "cause"). Thus, there is no need to address the issue of actual prejudice since both cause and actual prejudice are required to meet the pre-AEDPA standard.

Goldblum has not established a fundamental miscarriage of justice through alleging that counsel failed to "investigate, preserve and produce vital scientific evidence of blood spatter." First, the fact of the matter is that defense counsel never had the opportunity to "preserve" the blood spatter, since Wilhelm's car was not in defendant's control after the murder, and no photographs were taken of the blood on the dashboard. Thus, counsel simply had no means by which to "preserve" this evidence, and this claim must be rejected.

Goldblum's claim concerning investigating and producing scientific evidence is, however, a claim which requires some analysis. Indeed, the real issue here is whether counsel was ineffective for failing to do more with the blood spatter evidence than he did at trial. Specifically, it is alleged that counsel could have presented expert testimony which "would have proven that the Commonwealth's principal witness, Clarence Miller, was the person who stabbed and killed the victim, Mr. Wilhelm." The record in this case does not support this contention, and a review of the law applicable to the underlying claim, i.e., ineffective assistance of counsel, is necessary at this point.

The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)).

> Thus the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

Fretwell, 506 U.S. at 369 (citing United States v. Cronic, 466 U.S. 648, 658 (1984)). See also Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect). The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: 1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's

conduct.  <u>Strickland</u>, 466 U.S. at 690.  A petitioner who claims that he or she was denied effective assistance of counsel carries the burden of proof.  <u>Cronic</u>, 466 U.S. at 658.

The first prong of the <u>Strickland</u> test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  <u>Strickland</u>, 466 U.S. at 688.  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." <u>Id</u>. at 689.  The question is not whether the defense was free from errors of judgement, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. <u>Id</u>.

The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable.  <u>Strickland</u>, 466 U.S. at 689.  To prove prejudice, a defendant must show that there is a reasonable probability that, <u>but for</u> counsel's unprofessional errors, the result of the proceeding would have been different.  <u>Strickland</u>, 466 U.S. at 694 (emphasis added).  A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. <u>Id</u>.

Counsel's decision not to call a particular witness is normally never questioned because there are a number of strategic reasons for deciding not to call an expert to testify at trial.  <u>E.g.</u>, <u>United States v. McGill</u>, 11 F.3d 223, 227 (1st Cir. 1993).  In <u>McGill</u>, for example, counsel submitted an affidavit in which he "explained his thinking" concerning his strategic decision. <u>Id</u>.  Here, a similar explanation has been provided by trial counsel, i.e., he did not obtain an expert who

44

would not have been able to rule out his client's participation in the murder.  Indeed, that is precisely what the evidence in this case establishes, as will be discussed in more detail below.

"The right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued."  <u>Berryman v. Morton</u> 100 F.3d 1089, 1101 (3d Cir. 1996). Notwithstanding, defense counsel does have a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  <u>Strickland</u>, 466 U.S. at 691. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  <u>Id</u>.

As noted above, Goldblum interprets Dr. Wecht's opinion as unequivocally establishing that Goldblum did not participate in the murder of George Wilhelm.  Indeed, Dr. Wecht's affidavit, and the affidavits of other forensic experts, do appear to make a strong case for this proposition.  Dr. Wecht's testimony at the PCRA hearing, however, was clearly qualified concerning what he could establish by forensic evidence, and what was merely his weighing of probabilities.  Dr. Wecht conceded that the evidence of blood spatter did not rule out the Commonwealth's theory. Further, Wecht's opinion that Goldblum was not involved in the stabbing at all had less to do with the blood spatter on the dashboard, and more to do with Wecht's personal view of other, non-forensic evidence, such as Wilhelm's dying statement.  In fact, the lack of certainty in Dr. Wecht's sworn testimony, as opposed to his affidavit, was the basis of the PCRA court's denial of relief.

In this respect, Goldblum would like the court to make its own factual findings, and its own record.  This is not permitted as a hearing with respect to this issue was held, and findings were made.  These factual findings may not lightly be ignored by this court.  Also, even where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's

legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000).  A federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence pursuant to 28 U.S.C. § 2254(e).  A petitioner may also challenge the decision of the state court on the basis that it is an unreasonable determination of facts as contemplated under 28 U.S.C. §2254(d)(2).  In this case the former standard applies as the following analysis will disclose.

With respect to 28 U.S.C. § 2254(d)(2), which dictates that federal habeas relief may be granted when the state court adjudication was based on an unreasonable determination of the facts in light of the evidence presented, the petitioner must demonstrate that a reasonable fact-finder could not have reached the same conclusions given the evidence.  If a reasonable basis existed for the factual findings reached in the state court, then habeas relief is not warranted. Campbell v. Vaughn, 209 F.3d 280, 290-91 (3d Cir.2000), cert. denied, 531 U.S. 1084, 121 S.Ct. 789, 148 L.Ed.2d 685 (2001).  Furthermore, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  The relationship between these two provisions was addressed most recently in Lambert v. Blackwell, 387 F.3d 210, 235-36 (3d Cir. 2004):

> We . . . read § 2254(d)(2) and § 2254(e)(1) together as addressing two somewhat different inquiries.  The fundamental prerequisite to granting the writ on factual grounds is consideration of the evidence relied upon in the state court proceeding.  Section 2254(d)(2) mandates the federal habeas court to assess whether the state court's determination was reasonable or unreasonable given that evidence.  If the state court's decision based on such a determination is unreasonable in light of the evidence presented in the state court proceeding, habeas relief is warranted.

Within this overarching standard, of course, a petitioner may attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision. Here, section 2254(e)(1) comes into play, instructing that the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence. In this inquiry, a petitioner may develop clear and convincing evidence by way of a hearing in federal court as long as he satisfies the necessary prerequisites. See 28 U.S.C. § 2254(e)(2). In the final analysis however, even if a state court's individual factual determinations are overturned, what factual findings remain to support the state court decision must still be weighed under the overarching standard of section 2254(d)(2).

The issue of the fairness of the state court PCRA hearing is, therefore, relevant to this petition in that this would be a possible basis for this Court not according deference to the state court's factual findings (explicit and implicit).

Here, however, the hearing before the state court was both full and fair in that Dr. Wecht's testimony (whose testimony was the basis for the remand from Superior Court) was presented in its entirety[21]. Further, the state court rulings premised upon these factual findings cannot simply

---

[21]     In this respect, Goldlbum has also moved for a hearing concerning his claims to further develop the record. When a petitioner argues to a federal court conducting habeas review that he is entitled to a further evidentiary hearing before the merits of his claims are reached, the threshold question for the federal court is whether the habeas petitioner "has failed to develop the factual basis of his claim in State court proceedings." 28 U.S.C. § 2254(e)(2). Here, it appears to the Court that the factual basis for all of petitioner's claims was developed in the state courts, either through testimony or by affidavit or other exhibits. Thus, the undersigned saw no reason for holding a hearing in this case. When, as hear, the petitioner has developed a factual basis for his claim in state court, a presumption of correctness attaches to the state court's factual determinations, and the habeas petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. §2254(e)(1). However, even if, as Goldblum asserts, the record was not fully developed in the state court, and that this was not his fault, he would not be entitled to a hearing. Indeed, there is no absolute requirement that a hearing be held in any instance, as the ultimate decision to hold such a hearing lies squarely in the discretion of the court. Campbell v. Vaughn, 209 F.3d 280, 287 (3d Cir.2000). The exercise of that discretion is guided by a consideration of "whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." Id. In fact, the Supreme Court has noted that Congress, in passing AEDPA, intended "to avoid unneeded evidentiary hearings in federal habeas corpus cases. Williams v. Taylor, 529 U.S. 420, 436 (2000). Here, the state PCRA court conducted a

be rejected in favor of new ones reflecting this court's personal view of the matter, since Dr. Wecht's opinion, and its possible effect on the issue of ineffective assistance, have been the subject of a state court hearing and findings.  Finally, the basis for the state court's rulings cannot lightly be set aside in this case since they emanate entirely from Dr. Wecht's testimony and concessions he made on cross-examination.  While the affidavits provided purport to state findings with a reasonable degree of medical certainty, and while Dr. Wecht doggedly reasserted this position during the course of the state court hearing,  his testimony and, more significantly, the qualifications of his opinion identified on cross-examination, support the Superior Court's finding that Dr. Wecht's opinion was "fundamentally inconclusive." (Com. Ex. 138 at 11).  Judge McDaniel worded her conclusions somewhat differently, finding that neither Wecht nor Wolson were "hesitant to declare their feelings absolute" (133 at 4-5) and that the findings each made were "tentative" (Id.).

Goldblum's challenge in this instance is to a subsidiary finding of fact, i.e., the tentative nature (or not) of Dr. Wecht's testimony.  Thus, Goldblum must present clear and convincing evidence that this finding is incorrect.

A review of Dr. Wecht's testimony at the PCRA hearing establishes that he was forced to concede that he could not definitively rule out any of several possible scenarios concerning either the source of the blood (it could have been Miller's as well as the victim's since blood typing was attempted by police but was not possible, and Mr. Goldblum himself testified that Miller was struck

---

hearing which included lengthy testimony on the specific issue of ineffective assistance raised by petitioner.  Further, the state court record also contains extensive exhibits which further illuminate the factual basis for Goldblum's claims.  Thus, as the undersigned has already held, there is no need to hold a hearing since the state court record is complete.  A further hearing to present the evidence already set forth by Goldblum in the state courts would not have the potential to advance his claims.

in the face while in the car and had visible scratches after his arrest) or the reason the blood appeared where it did with "tails" indicating movement from the victim toward the passenger side of the car (it could have been deposited there by "cast off" from the weapon used to inflict stab wounds as opposed to bleeding from another source such as a bloody nose or blood running onto a limb that is then flailing about; or it may have been deposited there from stab wounds inflicted from a person seated to the right of the victim, or from wounds inflicted by a person seated behind him) (Transcript of October 19-20, 2000 at 45, 56, 65, 68, 79). Dr. Wecht's conclusions were based upon a wide range of evidence, and not simply forensic evidence, and he made what amounted to an educated guess as to what the "most likely" course of events was that evening (Id.). Thus, this is not a case where one scenario is completely ruled out by expert forensic evidence. Indeed, the best that can be said about Dr. Wecht's proposed testimony is that he would have testified that it was more likely that Miller stabbed Wilhelm (Id., at 68, describing the "scenario I deem most plausible . . ..").

In the face of this evidence, this court cannot say, indeed it is convinced otherwise, that the state court erred in its decision. The opinion offered by Dr. Wecht can reasonably be called indeterminate by the state court. Therefore, that subsidiary factual finding may properly be the basis for a finding that Dr. Wecht's testimony would not have changed the outcome of trial, since such a conclusion must involve an ascertainment of the amount of probative value such an opinion would have when viewed in light of cross-examination and other possible expert testimony in rebuttal.

Here, Goldblum himself admitted his presence at the scene. Miller's testimony, while the key to the case from the Commonwealth's standpoint, was subject to a great deal of impeachment by trial counsel. The Commonwealth proceeded on alternate theories that Goldblum actually

49

committed the stabbing, or that he assisted Miller in both planning and executing the stabbing.[22]
Further, the jury was already aware that Clarence Miller had incentive to fabricate.  The jury was also
aware that Goldblum and Miller went to some lengths to lure Wilhelm to the parking garage, and that
they agreed after the killing to lie to police in order to provide one another an alibi.  The jury was
convinced, in the face of Goldblum's denial, that he was involved in both the conspiracy to defraud
Wilhelm and in the arson of his restaurant.[23]  Further, the jury was aware that Goldblum attempted
to have Miller killed prior to trial, and that witnesses other than Miller tied Goldblum to the land fraud
and to the arson of Goldblum's business.  Thus, although expert testimony concerning the likelihood
of where the blood spatter came from would have been relevant at trial, it does not appear that such
evidence could possibly have been outcome determinative, particularly since, as the state court
determined, Dr. Wecht's opinion was not unqualified.  Therefore, this is not a situation where the
evidence not presented by counsel would have had the effect of preventing a reasonable juror from
convicting.  In fact, to a jury which was convinced on the evidence presented that Goldblum either
himself killed Wilhelm, or assisted Miller in the deed, Wecht's testimony would likely have had little
persuasive value.  Goldblum has, accordingly, not met the necessary standard to avoid the bar of
abuse of the writ under the pre-AEDPA standard.

Goldblum's second and third claims, which allege that counsel was ineffective for
failing to object to the jury instruction regarding accomplice liability, also do not meet the cause and

---

[22]    In fact, the court ultimately instructed the jury that, to find Goldblum guilty of first degree
murder they would either have to find that he stabbed Wilhelm, or that he and Miller had
agreed to kill Wilhelm when they arranged to take Wilhelm to the parking garage (Tr. 3462).

[23]

Again, Goldblum now concedes that he was involved in the arson, but he still denies any
involvement in the land fraud transaction.

prejudice prongs of the pre-AEDPA test.  Cause cannot be established since the instruction, and the

law governing the instruction, were known prior to the time that the first habeas case was filed.  Thus,

there is no need to address the actual prejudice prong, since cause cannot be established.  The court

must also determine if the miscarriage of justice exception applies.

Goldblum asserts that there were two errors in the accomplice instructions.  The first

was the court's alleged failure to instruct the jury that Goldblum could not be guilty of first degree

murder under Pennsylvania law unless he independently possessed the specific intent to kill.  The

second is that the court instructed the jury that Clarence Miller was an accomplice to Goldblum with

respect to some crimes.  Since these claims could have been made in the prior habeas petition, and

cause for the failure cannot be established, they are barred by the abuse of the writ doctrine unless the

errors "probably resulted in the conviction of one who is actually innocent." Schlup, 513 U.S. at 327,

Minarik, 166 F.3d at 607.

At the outset, a framing of the constitutional nature of a challenge to a state court's jury

instructions would be helpful.  States are free to set definitions of criminal offenses. Smith v. Horn,

120 F.3d 400, 414 (3d Cir. 1997). "However, once the state has defined the elements of an offense,

the federal Constitution imposes constraints upon the state's authority to convict a person of that

offense." Id.  Specifically, the Due Process Clause of the Fourteenth Amendment "protects the

accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to

constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25

L.Ed.2d 368 (1970).  Thus, a "jury instruction that omits or materially misdescribes an essential

element of an offense as defined by state law relieves the state of its obligation to prove facts

constituting every element of an offense beyond a reasonable doubt, thereby violating the defendant's

federal due process rights." Smith, 120 F.3d at 415; see also Sandstrom v. Montana, 442 U.S. 510, 523, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).   In this respect, jury instructions only become constitutionally defective when there is a *"reasonable likelihood"* that the jury has applied the challenged instructions in a way that violates the Constitution." Smith, 120 F.3d at 411 (emphasis in original) (quoting Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) and Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).   A court's analysis of challenged instructions "must focus initially on the specific language challenged." Smith, 120 F.3d at 411.   After that, the "allegedly constitutionally infirm language must be considered in the context of the charge as a whole." Id.

In this case, the important aspects of the charge to the jury in this case are these.   First, Judge Ziegler properly instructed the jury on the mens rea element of first degree murder under Pennsylvania law (Tr. 3430)("First degree murder is malice with the specific intent to kill . . ..").   He then described the elements of the other offenses, being Arson (the arson of Goldblum's restaurant), Solicitation to Commit Arson (Goldblum's asserted deal with Wilhelm as the "torch man"), and Conspiracy to Commit Theft by Deception (concerning the earlier land fraud committed by Miller, Dedo and Goldblum).   Judge Ziegler then gave the following instruction concerning accomplice liability generally:

> Now, running through this case is the legal question of an accomplice. A person may be guilty of a crime although he did not commit the specific offense. This occurs when he acts as an accomplice of the one who commits the crime. A person is an accomplice or legally accountable for the conduct of another when he: 1. With intent of promoting or facilitating the commission of a crime he aids or agrees or attempts to aid such other person in planning or committing the crime or he solicits such other person to commit the crime.

Now, in order to find a person guilty as an accomplice, the evidence must be established beyond a reasonable doubt of a share criminal intent with the other person. That is, both persons must intend that the criminal act occur.

Now, what does that mean? By "shared criminal intent" we mean that both men, to be found guilty, even though only one committed the act, both intended that the specific crime, which was completed, was intended. An example follows: If two men specifically agree that they are going to kill another man, and one man holds him and the other man shoots him, they are both guilty of first degree murder because one was an accomplice in the holding and the man who fired the shot, of course, is guilty of first degree murder because he inflicted the wound.

Another example of accomplice, in the law, is this: If two men agree to rob a bank and one man stands outside as the lookout and another man goes in, and the man who is inside the back shoots and kills a teller, they are both guilty of first degree murder, including the man standing out front, because he was an accomplice who was actively aiding the man who was inside the bank performing the robbery and both men should be guilty of first degree murder because of a shared criminal intent to commit that specific crime.

Now, an accomplice is one who knowingly and voluntarily cooperates or aids another in committing a crime. He is not merely a passive bystander who happens to observe an illegal act and does not participate in it. Nor is he someone who sees a crime being committed and fails to report it to the police. Instead, an accomplice is someone who knowingly, voluntarily and purposely joins with someone else in the performance of that specific crime.

Now, the Commonwealth of Pennsylvania contends that the defendant, Charles Godlblum, either killed George Wilhelm himself or was an accomplice with Clarence Miller in that killing.

(Tr. 3434-3436). The only part of this instruction which is inaccurate under Pennsylvania law is the bank robbery hypthetical, since the look out would have to have the specific intent to kill to be an accomplice to first degree murder.

Also relevant is a later portion of the instruction, which occurred after an extensive review of the testimony and the theories of the case presented by the prosecution and the defense.

There, Judge Ziegler further instructs the jury on application of accomplice liability to the specific

facts of this case as follows:

> In addition, if you find the evidence established beyond a reasonable
> doubt that Charles Goldblum was an accomplice with Clarence Miller in the
> intentional killing of George Wilhelm, you may find the defendant guilty of
> first degree murder.  In that event, you have to conclude that both Goldblum
> and Miller intended to kill George Wilhelm when they took him up there [to
> the parking garage] and that Goldblum was an accomplice with Miller in the
> killing of Mr. Wilhelm.  So, in that event, if you find that the defendant
> intentionally killed George Wilhelm, you may find him guilty of first degree
> murder.  If you find that he was an accomplice in such a killing, as I have
> defined that, you may also.

(Tr. 3462).

Goldblum asserts that the charge did not adequately explain the necessity that the jury

find Goldblum to have had the specific intent to kill before finding him guilty of first degree murder

as an accomplice.  In this respect, Goldblum relies upon the opinion in Laird v. Horn, 414 F.3d 419

(3d Cir. 2005).  In Laird, two men were accused of first degree murder, and the trial court gave an

accomplice instruction which failed to inform the jury that an accomplice must share the specific

intent to commit murder in order to be convicted as an accomplice. Id., at 422.  The Laird court found

that the instruction was improper, and denied the petitioner due process, because the charge

"reinforces the notion that an accomplice for one purpose is an accomplice for all purposes." Id., at

426.  Here, unlike Laird, the jury was told that an accomplice must possess the intent to commit the

specific offense, after it had been told that first degree murder required a specific intent to kill.  Thus,

this case does not involve a complete failure to instruct on specific intent vis-a-vis accomplice

liability.  Further, unlike the instructions in Laird, the court's instructions here clearly informed the

jury how the accomplice liability would have to work on the specific facts of this case, i.e., the jury

54

was told that Goldblum could be an accomplice in first degree murder only if he intended to kill Wilhelm when he and Miller agreed to take Wilhelm to the parking garage.

This case is, in fact, much more comparable to <u>Bronshtein v. Horn</u>, 404 F.3d 700 (3d Cir. 2005), which also involved an allegedly erroneous instruction on accomplice liability for first degree murder. The court in <u>Bronshtein</u> found that there was some "misleading" language which "suggested that Bronshtein could be found guilty of first-degree murder even if he did not have the specific intent to kill." <u>Id</u>., at 711. Nonetheless, the trial court did accurately inform the jury that shared specific intent is necessary for a finding of first degree murder on accomplice liability. Specifically, the instruction in <u>Brohnstein</u> contained the same faulty hypothetical used by Judge Ziegler here, i.e., it implied that the jury could find the defendant guilty of first degree murder as an accomplice if it found that he had conspired to rob the victim, but then his co-defendant killed the victim in the course of the robbery. <u>Id</u>., at 711. This flaw in the charge, though, was rendered harmless because the court had specifically instructed the jury that it had to find a "shared . . . specific intent to kill" in order to convict of first degree murder as an accomplice, and because the jury also convicted Bronshtein of conspiracy to commit murder. <u>Id</u>. Here, the same analysis applies.

The only inaccuracy in the court's charge in this case is the bank robbery hypothetical, which does not accurately reflect Pennsylvania law. First, this is not a case where Goldblum and Miller agreed to rob the victim, which robbery then turned into a killing. Thus, there is no likelihood that the jury in this case was confused by the bank robbery hypothetical in rendering its verdict. Therefore, while the erroneous hypothetical **was** likely to confuse the jury in <u>Bronshtein</u>, which did involve a robbery/murder, it was not likely to cause confusion here since there was no such scenario presented by the facts of the case. Further, and more importantly, any possible confusion was

explicitly cured by the court during its instruction on how to apply the accomplice liability charge to this specific factual situation.  The jury was told outright by Judge Ziegler that Goldblum could not be an accomplice in first degree murder unless they found "both Goldblum and Miller intended to kill George Wilhelm when they took him up there" (Tr. 3462).  Clearly, the jury is being informed that agreement between Goldblum and Miller on the killing itself was a necessary element for a finding of accomplice liability.  Therefore, this case does not even rise to the level of <u>Bronshtein</u>, since there is no likelihood at all that the jury found Goldblum guilty as an accomplice on the mistaken belief that they did not have to find a specific intent to kill on his part.

A similar analysis applies to the other complaint concerning the jury charge.  In the course of instructing the jury on the competing testimony in this case, and as a prelude to giving a charge favorable to Goldblum, Judge Ziegler noted:

> The chief accuser relative to the defendant's complicity in this crime is Clarence Miller.  Based upon Miller's testimony it is clear to the court that Miller is an accomplice in some of these crimes.

(Tr. 3451).  This is absolutely a correct statement by the trial court.  Miller conceded his complicity in the land fraud scheme at least.  The court then gave an instruction on how a jury should view an accomplice's testimony "with disfavor" and to view it as being from a "corrupt and polluted source" since such a person "may falsely blame others . . .." (Tr. 3451-3452).  The undersigned cannot fathom how this instruction prejudiced Goldblum in the least, and it certainly cannot have created constitutional error  sufficient to establish a fundamental miscarriage of justice.

Goldblum's fourth claim, that the police investigative files were intentionally destroyed, does not fail on the "cause" prong since the matter came to light only after the first habeas petition had been litigated.  However, Goldblum cannot establish how the absence of the investigative

files, **beginning more than 15 years after his conviction**, somehow infected his trial with

constitutional error.  Indeed, he has failed to identify any specific evidence he believes was in the file

that is no longer available to him (and the Commonwealth in 1996 provided all of the information in

its possession), nor has he even identified in general what type of evidence he believes may have been

present.  Thus, there is no manner in which "actual prejudice" can be established with respect to the

loss of the investigative file.[24]

        A similar analysis applies to Goldblum's fifth claim, that Miller has given yet another

statement inconsistent with his trial testimony.  While "cause" is not the issue since the statement was

not made until after the prior habeas petition had been dismissed, Judge Sensenich's prior description

of the evidence at trial concerning Clarence Miller's credibility is persuasive in this instance as well

in establishing that there has been no "actual prejudice" from the failure to have Miller's statement

at trial.

        With respect to Miller's latest version of events, it should additionally be noted that not

every change in testimony from a Commonwealth witness will justify a new trial.  Even where a

witness entirely recants his earlier version, that new change in testimony is rightly viewed with

skepticism.  In fact, Pennsylvania has historically viewed recantation as "one of the least reliable

forms of proof." Commonwealth v. McCracken, 540 Pa. 541, 659 A.2d 541, 545 (Pa.1995).  Federal

law is consistent with Pennsylvania's approach in that recanting affidavits and witnesses are viewed

---

[24]    At the initial conference before the Court in this matter, counsel for petitioner argued that
photographs of the crime scene, and more specifically the dashboard, may have existed at
some point.  That issue, however, has been put to rest by the proceedings in the state court.
Indeed, there is no indication that there ever were photographs of the dashboard, or that any
basis for the blood spatter evidence existed other than Detective Freeman's recollection.  This
is, therefore, a non-issue.

with "extreme suspicion" <u>Spence v. Johnson</u>, 80 F.3d 989, 1003 (5th Cir.), <u>cert. denied</u>, 519 U.S. 1012 (1996). Here, of course, there is no actual "recantation" testimony because Clarence Miller has not been called to actually give sworn testimony rebutting his trial testimony. Rather, before the court is an out-of-court declaration by Miller which, although inconsistent with his trial testimony, does not purport to exonerate Goldblum. Indeed, Miller confirmed in his comments to Warden Gigliotti that Goldblum participated in Wilhelm's killing. The only change is that Miller now admits that he, too, inflicted some of the wounds. This is, therefore, merely one more piece of evidence, among many, which would be used to impeach Miller's credibility.

Miller's difficulty with the truth, however, was known to the defense at trial, and was exploited during the course of the trial. Further, the issue of Miller's credibility in light of later-made inconsistent statements was also explored in the prior habeas petition, and the same analysis applies here. The fact that there is now new evidence to support a theory already advanced at trial is not sufficient to establish actual prejudice, i.e., that the trial was infected with constitutional error. What we have, instead, is a situation where a witness who was already painted by the defense (and the prosecution) as a liar now has made more statements that are at odds with his trial testimony. Superior Court found that this was not sufficient to state a claim justifying PCRA relief. In the same fashion, this evidence is simply not sufficient to warrant a finding of actual prejudice so as to avoid the bar occasioned by abuse of the writ.

**D.     Certificate of Appealability.**

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). Petitioner Goldblum has, for

the foregoing reasons, not made a showing sufficient to avoid an abuse of the writ bar to this claims. Accordingly, a certificate of appealability should be denied.

## III.    **CONCLUSION**

It is respectfully recommended that the instant petition for writ of habeas corpus be dismissed and that a certificate of appealability be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.


 /s/Lisa Pupo Lenihan
Magistrate Judge Lisa Pupo Lenihan



Dated: October 28th , 2005

Cc:     Honorable Arthur J. Schwab

        All counsel of record